[No. D011075. Fourth Dist., Div. One. July 15, 1991.]

MERRILL L. KIRKPATRICK et al., Plaintiffs and Appellants, v.
CITY OF OCEANSIDE et al., Defendants and Respondents.

COUNSEL

Davis, Punelli & Willard and Robert E. Willard for Plaintiffs and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Marvin Goldsmith, Assistant Attorney General, Randall B. Christison and Richard D. Hendlin, Deputy Attorneys General, Jennings, Engstrand & Henrikson and C. Michael Cowett for Defendants and Respondents.

OPINION

**HUFFMAN, J.**—Merrill L. Kirkpatrick and Rosanna F. Kirkpatrick (Kirkpatricks), husband and wife owners of an Oceanside mobilehome park named Laguna Vista Mobile Estates, appeal from an order dismissing this action after the trial court sustained without leave to amend general demurrers brought by the State of California (State) and the City of Oceanside (City) to Kirkpatricks' complaint for inverse condemnation and declaratory relief.[1] Kirkpatricks sought to have the City's mobilehome rent control ordinance, Ordinance No. 82-27 (Ordinance), declared unconstitutional as applied to their park and to have its application in conjunction with the State's Mobilehome Residency Law (Civ. Code, § 798 et seq.) declared a confiscatory "taking" of their property by inverse condemnation. We affirm in part and reverse in part for the reasons explained below.

FACTUAL AND PROCEDURAL BACKGROUND

For purposes of reviewing the order sustaining the general demurrers, we accept all facts alleged in the complaint as true, and also consider matters

---

[1]The order of dismissal was properly appealable under Code of Civil Procedure section 581d as the equivalent of a judgment.

properly judicially noticed. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) The complaint originally alleged three causes of action, but Kirkpatricks conceded at the hearing on the demurrer that the second cause of action for deprivation of civil rights in violation of 42 United States Code sections 1981 and 1983 was not viable.

The first cause of action alleges the Kirkpatricks are the owners ("Lessees under a 75-year lease terminating in August 2052") of a 272-space mobile-home park (270 mobilehome rental spaces and 2 spaces occupied, without charge, by the park's management) in Oceanside, California, which began operating in July 1978, and which includes amenities such as "lakes, a clubhouse, a swimming pool, etc."

It further alleges City enacted its Ordinance on June 23, 1982, that such has been amended at various times, is codified as chapter 16B of the City's code, has had administrative procedural guidelines (Guidelines) adopted for its enforcement and has been enforced since its enactment by the Oceanside Manufactured Home Fair Practices Commission (Commission) which was created by the Ordinance "to effectuate the provisions and purposes of the Ordinance."

The first cause of action then asserts the Ordinance as applied in combination with the State's Mobilehome Residency Law, which was adopted in 1978, effects a regulatory taking by not allowing the Kirkpatricks a "just and reasonable return" on their property, or on their investment, in violation of the Fifth and Fourteenth Amendments of the United States Constitution and article I, section 19 of the California Constitution. Kirkpatricks allege exhaustion of all administrative and other remedies under the Ordinance and before the Commission. They attach a copy of the Ordinance and its Guidelines as an exhibit to the complaint.

The third cause of action incorporates all the allegations of the first and second causes of action and adds information concerning Kirkpatricks' investment and rate of return on the rent-controlled units of their park. Paragraphs 20 and 21 of this cause of action state:

"20. Plaintiffs' total investment in their park is $3,500,116.00 or $12,963.00 per rental space. Plaintiffs' per space return on the 110 spaces subject to rent control for 1988 was $272.55 per space.

"21. Plaintiffs' rate of return on rent controlled units is approximately 2% per annum, well below established going rates. Such a return does not constitute a just and reasonable or fair return as required by the California and United States Constitutions and as contemplated by the Oceanside

Ordinance itself, and application of the Oceanside Rent Control Ordinance (Exhibit A) to Plaintiffs has accordingly deprived them of just compensation and a fair return on their investment in violation of the California State and United States Constitutions as hereinabove alleged."

Based on these economic facts, Kirkpatricks allege they made application to City for a "hardship or fair return rent adjustment for the years 1989 and thereafter," but City refused to consider their application as it did not fall within the adjustment formulas and procedures provided by the Ordinance and City asserted earlier litigation concerning the Ordinance was res judicata to their claims of unfair returns. Kirkpatricks claim an actual controversy has thus arisen and ask for declarations that the Ordinance as applied to their park does not provide them a fair return on their investment, or just compensation for their property, and they are not foreclosed from bringing this lawsuit by the res judicata effect of earlier actions concerning the Ordinance.

In addition, Kirkpatricks seek a declaration that City must consider their application although it does not conform to the express formulas and procedures in the Guidelines of the Ordinance.

State's motion to strike and demurrer to Kirkpatricks' complaint was heard at the same time as City's demurrer. State sought to strike allegations of the first cause of action which contradicted the language of the State Mobilehome Residency Law and demurred to the complaint on grounds it failed to state a cause of action against State, was uncertain and ambiguous, and was barred by our decision in *Oceanside Mobilehome Park Owners' Assn.* v. *City of Oceanside* (1984) 157 Cal.App.3d 887 [204 Cal.Rptr. 239].

City's demurrer also raised the bars of res judicata and stare decisis based on *Oceanside*, and in addition, based on our unpublished opinion in *Kirkpatrick* v. *Manufactured Home Fair Practices Commission* (June 24, 1987) D004855. City opined the Kirkpatricks were relying on the Ninth Circuit decision *Hall* v. *City of Santa Barbara* (9th Cir. 1986) 833 F.2d 1270 to again challenge the facial validity of the Ordinance and contended administrative mandamus under section 1094.5 of the Code of Civil Procedure was the exclusive remedy for challenging any decision by the Commission regarding rental adjustments under the Ordinance.

At oral argument held May 19, 1989, the trial court declined Kirkpatricks' request to amend the complaint and confirmed its earlier telephonic ruling granting State's motion to strike, overruling State's special demurrer, sustaining without leave to amend State's and City's general demurrers to the

Kirkpatricks' complaint and dismissing, on its own motion, the action in its entirety.

On July 24, 1989, the court signed the formal order sustaining the general demurrers without leave to amend and dismissing the case in its entirety, stating, as grounds:

"(a) The complaint fails to allege facts sufficient to state a cause of action; and

"(b) The first and second causes of action are barred by the doctrines of *res judicata* and *collateral estoppel* in that the issues alleged therein have been previously litigated between the parties; and

"(c) The plaintiffs primarily rely upon the case of *Hall* v. *City of Santa Barbara* [, *supra*, 833 F.2d] 1270, in support of their first and second causes of action which case is contrary to the law as stated by California courts and is thus inapplicable under the doctrine of *stare decisis*; and

"(d) General demurrers to the third cause of action are sustained without leave to amend because plaintiffs have failed to exhaust their administrative remedies, have failed to challenge any action taken by the City of Oceanside or its commissions, and are unable to amend the complaint to correct said deficiencies."

On August 7, 1989, the court denied as untimely Kirkpatricks' request for reconsideration of the motions. After granting their motion to set aside the denial, the court denied the motion to reconsider on grounds there was no change in the facts. Kirkpatricks timely appealed from the original formal order sustaining the demurrers and dismissing their case.[2]

## DISCUSSION

On appeal, Kirkpatricks argue, despite City's and State's assertion otherwise, they are not challenging the facial validity of the Ordinance. They contend that contrary to the trial court's ruling, they have adequately alleged exhaustion of administrative remedies; they have adequately alleged a 2

---

[2]The notice of appeal states Kirkpatricks are appealing from orders made and entered on May 15 and 19, 1989; July 24, 1989 and August 7, 1989. The May 15 and 19 orders, the telephonic and the minute order of the hearing, were incorporated into the formal July 24 order sustaining the demurrers and dismissing the case. The August 7, 1989, order denied the original motion for reconsideration which was subsequently vacated and heard after the notice of appeal was filed. We treat the appeal, as all parties in their appellate briefs treat, as being timely filed from the July 24 order.

percent return on their investment is confiscatory; the doctrines of res judicata and collateral estoppel do not bar their action for inverse condemnation based on allegations of not receiving a fair and reasonable return on their investment or property; *Hall* v. *City of Santa Barbara*, *supra*, 833 F.2d 1270, is good law and should be followed; and the State is jointly responsible for the taking of their property without just compensation. They thus assert the trial court committed reversible error in sustaining the demurrers of the State and City and in dismissing their case.

Although the trial court based its ruling on specifically stated reasons, our review of the ruling must address whether the order sustaining the demurrer and dismissing the complaint is supportable on any grounds, including those stated, as it is the validity of the court's action and not its reasons for its action that is reviewable. (*Weinstock* v. *Eissler* (1964) 224 Cal.App.2d 212, 225 [36 Cal.Rptr. 537].)

Basically the issue is whether Kirkpatricks, whose mobilehome park is regulated by City's Ordinance and State's Mobilehome Residency Law, each pursuant to their police powers, may state a claim for inverse condemnation. What we examine is whether the trial court properly ruled, as a matter of law, the Kirkpatricks can state no claim. The issue is not whether they will eventually recover damages from the City or State for a regulatory taking, but whether their claim can be resolved without a factual hearing. Our inquiry is limited to whether, under the facts taken to be true as pled in the complaint, and as supplemented by matter that properly may be judicially noticed, the Kirkpatricks have shown they may be entitled to any relief against the City or State. (*Blank* v. *Kirwan*, *supra*, 39 Cal.3d at p. 318.) As the demurrers were sustained without leave to amend, our review is limited to the sufficiency of the pleadings as filed by Kirkpatricks. (*Farmers Ins. Exchange* v. *State of California* (1985) 175 Cal.App.3d 494, 499 [221 Cal.Rptr. 225].)

To resolve this issue, we first consider the basics of governmental regulation and how it interacts with a property owner's right to be reimbursed for regulatory takings. We then look to the effect of procedures and earlier decisions regarding the Ordinance and the parties to this litigation to determine whether Kirkpatricks can state a claim against City or State.

I

*Regulatory Takings and Inverse Condemnation*

■ The Fifth Amendment to the United States Constitution provides, "[n]o person shall be . . . deprived of . . . property, without due process of

law; nor shall private property be taken for public use, without just compensation." The Fifth Amendment is made applicable to the states by the due process clause of the Fourteenth Amendment. (*Chicago, Burlington &c. R'd v. Chicago* (1897) 166 U.S. 226, 239 [41 L.Ed. 979, 985-986, 17 S.Ct. 581].) Article I, section 19 of the California Constitution similarly provides compensation is required when property is "taken or damaged." An exception to this rule of compensation is recognized for damages inflicted in the course of a proper exercise of the police power. (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 305 [90 Cal.Rptr. 345, 475 P.2d 441].)

Conversely, a police power regulation that "goes too far" will constitute a taking under the principles of inverse condemnation. (*Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 325-326, 43 S.Ct. 158, 28 A.L.R. 1321].) As the United States Supreme Court stated in *Agins* v. *Tiburon* (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138]:

"The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, [citation], or denies an owner economically viable use of his land, [citation]. The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." (*Id.* at p. 260 [65 L.Ed.2d at p. 612].)

■ Specifically in the area of rent control ordinances or regulations, the United States and California Supreme Courts have held such legislation is constitutionally valid as a proper exercise of the police powers and not a per se taking for purposes of the Fifth Amendment's requirement of due compensation (see e.g., *Pennell* v. *San Jose* (1988) 485 U.S. 1, 11-12 [99 L.Ed.2d 1, 13-15, 108 S.Ct. 849] and this court's opinion in *Yee* v. *City of Escondido* (1990) 224 Cal.App.3d 1349, 1353 [274 Cal.Rptr. 551]), so long as it is " 'reasonably calculated to eliminate excessive rents and at the same time provide landlords with a just and reasonable return on their property.' " (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001].) Even if it can be determined that the provisions of a rent control regulation are valid on their face, the true test of reasonableness or confiscatory effect depends ultimately on the result reached. (*Ibid.*)[3]

---

[3]Our Supreme Court has specifically cautioned the standard in *Birkenfeld*, concerning a "just and fair return on [landlords'] property" in determining whether there has been a legitimate exercise of local police power, is not to be taken as a constitutional test for determining the validity of a rent control ordinance. (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 681, fn. 35 [209 Cal.Rptr. 682, 693 P.2d 261].) In *Fisher*, the court held a rent control ordinance that provided for a fair return on the landlords' investment survived a facial challenge. (*Id.* at p. 686.) The Supreme Court would not venture to suggest what standard would be used when it reviewed a challenge to rent control as applied. (*Id.* at p. 681, fn. 35.)

■ In analogous situations involving whether a governmental regulation constituted a "taking," the United States Supreme Court has identified three factual inquiries into the circumstances of each particular case which should be considered for such determination: "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.' [Citations.]" (*Connolly* v. *Pension Benefit Guaranty Corp.* (1986) 475 U.S. 211, 224-225 [89 L.Ed.2d 166, 178-179, 106 S.Ct. 1018].) As noted in *Connolly*, the question about the effect of a particular regulation or ordinance on a specific business is a factual question. (*Ibid.*; see also *Andrus* v. *Allard* (1979) 444 U.S. 51, 63-66 [62 L.Ed.2d 210, 221-223, 100 S.Ct. 318] and *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 648, 98 S.Ct. 2646].) Being so, it is generally not suited for evaluation on demurrer. (*MacDonald, Sommer & Frates* v. *Yolo County* (1986) 477 U.S. 340, 349 [91 L.Ed.2d 285, 294-295, 106 S.Ct. 2561].)

As further noted by one law review writer on the subject of inverse condemnation, "[d]espite general judicial reluctance to invalidate regulations of conduct on the ground that ensuing economic loss constitutes a taking or damaging of private property, appellate opinions have persisted in giving lip service, at least, to the thought that such a result is legally possible." (Van Alstyne, *Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria* (1971) 44 So.Cal.L.Rev. 1, 4.)

We recently gave such lip service in our opinion, *Yee* v. *City of Escondido, supra,* 224 Cal.App.3d at pages 1358-1359, footnote 12. In *Yee,* we acknowledged a facially valid regulation, similar to the one in this case, could be challenged as applied, if appropriate prerequisites were satisfied; we recognized that such challenge would be a question of fact. (*Ibid.*)

Here, Kirkpatricks argue they have alleged two causes of action, the first and the third,[4] which challenge the validity of the Ordinance as applied. In each they allege the effect of the Ordinance's application results in their not receiving a "just and fair return" on their property, or on their investment. Kirkpatricks have thus alleged some facts which, if proven, would support a determination the government has gone too far and taken their property without just compensation. Quite possibly they could allege other facts which might bolster their allegations. Unless some earlier action in this case or another case would preclude Kirkpatricks from challenging the application of the Ordinance at this time, the trial court erred in sustaining the City's

---

[4]Kirkpatricks do not appeal from the dismissal of the second cause of action.

and State's demurrers without leave to amend and in dismissing Kirkpatricks' complaint against the government entities as the issue of whether there has been a taking is essentially an "ad hoc factual inquiry."

We thus address the specific reasons stated by the trial court for its rulings to determine whether there was error.

## II

### Exhaustion of Administrative Remedies

The complaint alleged, without specific facts, Kirkpatricks had exhausted their administrative remedies. Although the City and State conceded Kirkpatricks had applied for a permissive rent increase under the Ordinance the year of this lawsuit, each noted the Ordinance provided landlords/owners of mobilehome parks an alternative to the permissive rent adjustment procedure and formula for annually adjusting their rolled-back rents. Because Kirkpatricks had not applied for the alternative net operating income (NOI) adjustment, the City and State argued Kirkpatricks had failed to exhaust their administrative remedies, thereby precluding them from bringing a legal action in court. (See *Oceanside Mobilehome Park Owners' Assn.* v. *City of Oceanside, supra,* 157 Cal.App.3d at pp. 893-896 for explanation of each adjustment formula.)

Kirkpatricks attempted to show it would be futile to apply for the NOI and sought leave to amend the complaint to allege the specific facts of such futility. The court denied this request. We conclude the court abused its discretion in not allowing Kirkpatricks to amend their complaint to specifically plead the futility exception to the exhaustion of remedies requirement; the futility of applying for the NOI, as well as the futility of Kirkpatricks' request, is readily apparent from the record.

Although an allegation of exhaustion of administrative remedies is a contention and legal conclusion which is properly subject to demurrer (*County of Los Angeles* v. *Farmers Ins. Exchange* (1982) 132 Cal.App.3d 77, 83 [182 Cal.Rptr. 879]), Kirkpatricks' unfiled, proposed first amended complaint submitted with their motion to reconsider the trial court's sustaining of the demurrers and dismissing their case, as well as their arguments at the original hearing on the demurrers, reveal the futility of their attempts to proceed through the proper administrative channels to obtain review on their application for a "fair return." Kirkpatricks have alleged they utilized the alternative procedures each year since going under rent control; that operation of the NOI formula has never given them a greater adjustment than the permissive adjustment; that the permissive adjustment does not give them a

fair return; that they are only getting a 2 percent return on their property under rent control; that in calculating the NOI formula for this particular year, they determined it would not be as much as the permissive adjustment they obtained—thus going through the formality of submitting another NOI application would have been futile; that they instead filed for a hardship adjustment; that City has refused to allow the Commission to conduct a hearing on that application, citing administrative procedures as not allowing such a procedure.

We cannot conceive of a clearer "Catch-22" situation than the one presented by this case. City is exalting form over substance to foreclose Kirkpatricks from having all relevant evidence considered concerning obtaining a fair return on their investment or property under the Ordinance. Granted, Kirkpatricks could have better framed their application in a form to ask for a hardship exception under the NOI. However, when it is alleged, as here, an administrative agency is stonewalling, on mere technicalities, the attempts of a party to use its administrative channels to obtain a fair hearing on the "fair return" issue, we conclude that party need not allege pursuit of further administrative remedies in order to invoke the jurisdiction of the courts. On this record it is clear Kirkpatricks have alleged the Commission would not have considered the data submitted in the hardship application even if properly presented in an acceptable NOI application. (See *Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830, 834 [112 Cal.Rptr. 761].)

Having sustained the City's demurrer without leave to amend the third cause of action on grounds the Kirkpatricks could not plead exhaustion of administrative remedies, the trial court did not reach the City's contention administrative mandamus under section 1094.5 of the Code of Civil Procedure is the exclusive remedy for challenging the constitutionality of the Ordinance as applied to the Kirkpatricks. However, "[a]s against a general demurrer . . . it is unimportant that [the Kirkpatricks'] pleading was not in form a petition for mandamus . . . . All that is required is that [they] state facts entitling [them] to some type of relief, and if a cause of action for mandamus . . . has been stated, the general demurrer should have been overruled. [Citations.]" (*Boren* v. *State Personnel Board* (1951) 37 Cal.2d 634, 638 [234 P.2d 981].) ■ Thus, "an action for declaratory relief to review an administrative order should be regarded as a petition for a writ of mandate for purposes of ruling upon a general demurrer. [Citations.]" (*Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 546 [99 Cal.Rptr. 745, 492 P.2d 1137].)

At oral argument before this court, City conceded, if exhaustion of administrative remedies were properly pleaded, traditional mandamus could

possibly provide Kirkpatricks an appropriate remedy. We concur. Because Kirkpatricks might be able to do so, the trial court erred in sustaining the City's demurrer without leave to amend.

Moreover, Kirkpatricks may have been able to state a cause of action for administrative mandate. ■ For such to apply, an agency's adjudicatory decision must have been rendered as a result of a proceeding that requires a hearing be given at which evidence is to be taken. (Code Civ. Proc., § 1094.5, subd. (a); *Keeler* v. *Superior Court* (1956) 46 Cal.2d 596 [297 P.2d 967].) Whether a hearing was in fact held, however, is not determinative. If one is required by law, administrative mandamus may be appropriate to secure it. (*Fascination, Inc.* v. *Hoover* (1952) 39 Cal.2d 260, 268[246 P.2d 656].) Likewise, when a hearing is not explicitly required by law, but is compelled by due process considerations (i.e., where the statute, rule, or ordinance concerned does not provide for a hearing when property interests are involved), administrative mandamus may be the appropriate remedy to challenge the agency's refusal to provide one on grounds such refusal is a denial of due process. (See *Board of Regents* v. *Roth* (1972) 408 U.S. 564, 577 [33 L.Ed.2d 548, 560-561, 92 S.Ct. 2701]; *Rios* v. *Cozens* (1972) 7 Cal.3d 792 [103 Cal.Rptr. 299, 499 P.2d 979], vacated and remanded in 1973 in 410 U.S. 425 [35 L.Ed.2d 398, 93 S.Ct. 1019], reiterated and reinstated in 9 Cal.3d 454 [107 Cal.Rptr. 784, 509 P.2d 696]; see also *Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 165 [65 Cal.Rptr. 297, 436 P.2d 297].)

Although it is true rent control agencies are not constitutionally required to fix rents by the application of any particular method or formula (*Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184, 191), they must still, in application, avoid confiscatory results. (*Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at pp. 681-683.)

In this case, the letter denial by the City to Kirkpatricks' request for a fair return hearing on their application for adjustment of rent by the Commission could be construed as an adjudicatory action by the City. Because the Ordinance does not provide a procedure for the Commission to conduct a hearing on the specific form of application presented by Kirkpatricks after it has made such adjudicatory decision, a cause of action under administrative mandamus challenging City's refusal to allow a fair value hearing on grounds of a denial for due process could feasibly be stated. The trial court thus abused its discretion in failing to allow Kirkpatricks to amend their pleadings to allege either traditional or administrative mandamus, or both.[5]

---

[5]City's concern no hearing took place and consequently no evidence was taken which provides an administrative record to review under administrative mandamus is not fatal to the

## III

*Res Judicata, Collateral Estoppel and Hall*

The trial court ruled the first cause of action was barred by the doctrines of res judicata and collateral estoppel based on earlier litigation between the Kirkpatricks and the City. It also found the first cause of action could not be maintained based on the case of *Hall* v. *City of Santa Barbara, supra,* 833 F.2d 1270.

Both the City and the State had cited *Oceanside Mobilehome Park Owners' Assn.* v. *City of Oceanside, supra,* 157 Cal.App.3d 887, to which the Kirkpatricks were parties (members of the Oceanside Mobilehome Park Owners' Association), as estopping the first cause of action which alleged a taking based on the combined effect of the Ordinance and the State's Mobilehome Residency Law. In addition the City had cited our unpublished opinion in *Kirkpatrick* v. *Manufactured Homes Fair Practices Commission, supra,* D004855, as having res judicata effect on the application of the Ordinance to the Kirkpatricks' park. On appeal, both the City and the State also cite our recent decision in *Yee* v. *City of Escondido, supra,* 224 Cal.App.3d at pages 1353-1354, which criticized *Hall* and reaffirmed *Oceanside* as foreclosing any action based on the combined effect of the Mobilehome Residency Law and the Ordinance.

In their reply brief on appeal, Kirkpatricks, while not conceding any ground, defer to this court's holding in *Yee* concerning the issue of basing an inverse condemnation action against the State on the combined effect of the state statute working in conjunction with the Ordinance.

Because we find *Yee* determinative on the issue of whether Kirkpatricks can plead a cause of action against the State on a theory of combined liability, we find no error in the trial court's sustaining of the State's general demurrer without leave to amend.[6]  However, we do not find *Yee* or

---

Kirkpatricks' action. If a hearing is required by either the Ordinance or due process, the trial court must fashion a remedy to provide one. (See *Fascination, Inc.* v. *Hoover, supra,* 39 Cal.2d 260, 268.)

We note, both Kirkpatricks and the City also agreed at oral argument here if a hearing were ultimately to be held to determine the constitutional standard for a fair return, the hearing should be before the superior court and not a lay commission. Since at this stage of the proceedings we merely reverse with directions to the trial court to permit Kirkpatricks to amend their complaint, we do not address whether such agreement is a proper solution to the matter. We leave that resolution to the parties and the trial court; Kirkpatricks are free to seek whatever remedy they deem appropriate.

[6]Kirkpatricks conceded at the trial court hearing the State was not involved in the third cause of action's attempt to allege a taking based on not receiving a fair return under the Ordinance. They also agreed with the court their claim for inverse condemnation on the first

*Oceanside* preclude the possibility of Kirkpatricks stating a valid cause of action against the City for a taking based on their not receiving a fair return on their investment or property.

While it is well established a trial court may take notice of an earlier judgment in deciding whether to sustain a demurrer on res judicata grounds (*Carroll* v. *Puritan Leasing Co.* (1978) 77 Cal.App.3d 481, 486 [143 Cal.Rptr. 772]), res judicata, of which collateral estoppel is a part, will only " 'preclude[ ] parties or their privies from relitigating a cause of action that has been finally determined by a court of competent jurisdiction. . . . [Only an] issue necessarily decided in such litigation is conclusively determined as to the parties or their privies if it is involved in a subsequent lawsuit on a different cause of action.' [Citations.]" (*Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.* (1962) 58 Cal.2d 601, 604 [25 Cal.Rptr. 559, 375 P.2d 439].) Because Kirkpatricks were in "privity" with the parties in *Oceanside* due to their membership in the mobilehome owners' association, we must look at Kirkpatricks' claim of a taking in light of the issues decided in the earlier actions between the same parties to determine whether they can state a cause against the City.

A careful review of the issues decided in the *Oceanside* case reveals the issue of application of the Ordinance in this case was not involved or decided in that case. Although we upheld the constitutionality of the alternative fair return formulas provided in the Ordinance for yearly rent adjustments, our holding in *Oceanside* concerned the facial validity of the Ordinance and those provisions, not their constitutionality as applied. That this is so, a majority of this court reaffirmed in *Yee*. (*Yee* v. *City of Escondido*, *supra*, 224 Cal.App.3d at p. 1360.)

Nor did the decision in our unpublished case *Kirkpatrick, supra*, D004855, decide the same issues presented in this case. In that case, attached as appendix A to this opinion, we concluded the Kirkpatricks' park constituted a "new park" under the ordinance for purposes of determining the base year for setting the controlled rent; we determined the Commission did not err in finding Kirkpatricks were not entitled to a "space rent agreement exemption" as defined under the Ordinance; we found the Commission properly excluded Kirkpatricks' land lease costs as "debt service expenses" which are specifically excluded from normal operating expenses by the Ordinance; and we found it unnecessary to remand that case to the trial court to instruct the Commission to consider any and all evidence relevant to a just and reasonable return, not just evidence directed to the specific factors listed in the

cause of action was based simply on the state having enacted the Mobilehome Residency Law.

ordinance and guidelines, because the trial court had already ordered the Commission to do so. (*Kirkpatrick* v. *Manufactured Homes Fair Practices Commission, supra,* D004855.)

Since that *Kirkpatrick* case did not specifically deal with the issue of whether the yearly alternative formulas for rent adjustments provided a specific landlord a fair and reasonable return *in practice,* it does not have res judicata effect on that issue. As this court noted in *Yee,* the Ordinance "effects a transfer of value from landlords to tenants. The critical question is whether such a transfer can be justified by a rational governmental purpose, i.e., are the controlled rents fair and reasonable. In *Oceanside* we were forced to deal with this important question and concluded the ordinance there was rationally based. Here, [Yee's] complaints never allege the Escondido ordinance is irrational because it denies them fair and reasonable rents. Indeed, the owners have never attempted to obtain Escondido's approval for what they consider to be a 'fair' rent. In the absence of such a contention, we assume the rents provided for by the ordinance are fair. If they are, there is no 'taking.'" (*Yee* v. *City of Escondido, supra,* 224 Cal.App.3d at p. 1354.)

Unlike the Yees, Kirkpatricks have repeatedly attempted to obtain approval for what they consider to be a "fair" rent. They also have alleged the Ordinance does not provide them fair and reasonable rents. Moreover, *Yee* specifically states it was only concerned, as was *Oceanside,* with the facial validity of the Ordinance. (*Yee* v. *City of Escondido, supra,* 224 Cal.App.3d at p. 1360.) Under these circumstances, the factual issue raised by this complaint is not resolved by the earlier cases and is not appropriate for resolution at this pleading stage.

### DISPOSITION

The judgment of dismissal is affirmed as to the State.

The judgment of dismissal as to the City is reversed and remanded. The trial court is directed to vacate the judgment and order of dismissal and the order sustaining the City's demurrer without leave to amend, and enter in its place an order sustaining the City's demurrer with leave to amend. The trial court shall allow Kirkpatricks 30 days in which to file their amended action to state a proper cause under traditional or administrative mandamus, or both. If Kirkpatricks fail to file their amended action, the original judgment of dismissal will be reinstated.[7]

---

[7]In matters submitted to this court for judicial notice of actions taken subsequent to this appeal, it is noted that the City may not be considering all relevant evidence for a just and reasonable return as required under part IV of our unpublished opinion *Kirkpatrick* v.

The parties will bear their own costs on appeal.

Todd, Acting P. J., and Thompson, J.,* concurred.

---

*Manufactured Homes Fair Practices Commission, supra,* D004855. Because those subsequent matters are not properly before us for resolution at this time, we do not address the matter further.

*Retired Associate Justice of the Court of Appeal, Second District, sitting under assignment by the Chairperson of the Judicial Council.

284

[? Keenan G Casady, Clerk (B)]

JUN 24 1987

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

Court of Appeal Fourth District

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | | |
|---|---|---|
| MERRILL KIRKPATRICK, | ) | |
| Appellant, | ) | |
| v. | ) | |
| | ) | D004855 |
| MANUFACTURED HOMES FAIR PRACTICES | ) | |
| COMMISSION et al., | ) | |
| Respondents. | ) | (Super. Ct. Nos. N17905 |
| | ) | & N30819) |

APPEAL from a judgment of the Superior Court of San Diego County, Lawrence Kapiloff, Judge. Affirmed in part and reversed in part.

Merrill Kirkpatrick, owner of the Laguna Vista Mobilehome Park appeals the denial of his petition for a writ of mandate to require the Manufactured Home Fair Practices Commission (Commission) to grant Laguna Vista an exemption from a mobilehome rent control ordinance, to change its designation of Laguna Vista as a "new park" to allow him to pass along all his landlease costs to Laguna Vista's residences and to consider

any evidence relevant to a just and reasonable return. The Commission appeals from the court's order requiring it to consider Laguna Vista's land lease costs when calculating the amount of space rent Kirkpatrick can recover from Laguna Vista's residents.

### FACTS

Laguna Vista is a 272 space mobilehome park in Oceanside, California. It began operation in July 1978. All the initial residents were required to sign one-year leases containing two one-year options to extend the term. By the end of 1979, 267 spaces had been occupied. One of the five remaining spaces was reserved for Kirkpatrick's personal use.

On June 23, 1982, the City of Oceanside enacted a rent control ordinance for mobilehome parks. (Ord. No. 16B.) The ordinance rolled back rents to the level charged on December 31, 1979 and contained a formula for calculating a space rent ceiling for each mobilehome park and for calculating rent increases for subsequent years. The ordinance provided for the creation of the Manufactured Home Fair Practices Commission (§ 16B.4) and the adoption, by resolution of the City Council, of guidelines necessary to assist and direct the Commission in accomplishing its duties (§ 16B.4, subsection (F)). The ordinance stated it did not apply to spaces covered by leases which had terms longer than month-to-month that were in effect at the time the ordinance was enacted. (§ 16B,.

subsection (B).) It also exempted from rent control, mobilehome parks where at least 67 percent of the residents had agreed to a space rent schedule for the entire park. (§ 16B.7.)

The Oceanside Mobilehome Park Owner's Association challenged the ordinance as unconstitutional and sought an injuntion from the superior court. The superior court granted the injunction in September 1982. The City appealed. In June 1984, we reversed, finding the ordinance constitutional on its face. (Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside (1984) 157 Cal.App.3d 887.) In September 1984, the City enacted emergency legislation amending some of the dates in the rent control ordinance, e.g., the date when park owners were required to register with the Commission. (Ord. no. 84-37.) Two months later, the City adopted administrative procedural guidelines (Resolution no. 84-229) and began implementing the ordinance.

DISCUSSION

I

Kirkpatrick contends he was entitled to a "space rent agreement exemption" (agreement exemption) because he obtained long-term leases from more than 67 percent of Laguna Vista's residents. He contends the Commission erred in not counting spaces covered by long-term leases entered into before the ordinance became effective towards the 67 percent resident

consent needed for the agreement exemption and in construing the agreement exemption to require a uniform termination date for the spaces.[1]  He argues his entering into the leases was made in good faith reliance on the ordinance and represents substantial compliance entitling him to the exemption.

Kirkpatrick points to language in the section covering the requirements for an agreement exemption which states "The agreement need not be a formal lease or follow any prescribed format . . . ."  (§ 16B.7, subsection (2).)  He argues that from this language it must necessarily be inferred a lease is acceptable although not required and ·that obviously multiple leases would have to be executed since each lease covers only one mobilehome space.  Such an inference may be drawn, however, the ordinance elsewhere distinguishes between spaces covered by individually negotiated leases and those covered by an agreement consented to by at least 67 percent of the park residents.

Section 16B.3, subsection (B). provides· the ordinance "shall not apply to tenancies covered by a rental agreement in existence at the time this Chapter becomes effective where such agreement has a duration exceeding that of a month to month

---

[1]The leases between Kirkpatrick and the Laguna Vista residents have varying expiration dates depending on when the resident first moved into the park.

tenancy." In a separate section, the ordinance provides for a "space rent agreement exemption" (agreement exemption). (§ 16B.7.) This section provides for an exemption for the entire park, not just for a particular space covered by a long-term lease. To meet the criteria for an agreement exemption, "The agreement must be voluntarily consented to by at least one adult resident from sixty-seven percent (67%) of the manufac- tured home rental spaces within the park with the exception of those spaces exempted from the provisions of this Chapter pursuant to the provisions of Sec. 16B.3.B." (§ 16B.7, subsection (B)(3), italics added.) ·This same criteria is reflected in the administrative guidelines.[2]

The ordinance is clear in providing at least two different kinds of exemptions; one on a space-by-space basis when an individual resident has signed a long term lease with the park owner which was in effect on the date the ordinance became effective and another on a whole-park basis when 67 percent of

---

[2]The Guideline's categories for exemptions include "parks with twenty-five (25) spaces or less, new parks, travel trailer parks, rental agreements by space, and park rent schedules consented to by sixty-seven percent (67%) of the park sites . . . ." (Guidelines, § 4.1, subsection (A).) The Guidelines provide: "Spaces which are governed by an individual space rental agreement . . . shall not be included in the total number of park spaces when determining the sixty-seven percent 67% . . . ." (Guidelines, § 4.3, subsection (B)(5).)

■

the park residents[3] collectively agree to a rent schedule. The ordinance is also clear in stating that in order to fit within the agreement exemption for the whole park, there must be agreement by at least 67 percent of the residents who are not covered by long-term leases, i.e., those who are not already exempt under the ordinance.

Here, Kirkpatrick had negotiated individual long-term leases with 75 percent of the park residents; he did not have a collective agreement by more than 67 percent of the residents subject to rent control ordinance to a space rent schedule for the whole park. Thus, while 75 percent of Laguna Vista's spaces were exempted from the rent control ordinance because of the ordinance's non-applicability to spaces covered by pre-existing leases, Kirkpatrick failed to meet the requirements of the agreement exemption which requires collective agreement by at least 67 percent of those residents who are not already covered by long-term leases.

Kirkpatrick argues this interpretation is unreasonable because it would allow a minority of Laguna Vista's residents (here 67% of 25%, i.e., 16% of Laguna Vista's residents) to establish a rent schedule for the whole park, exempting the entire park from rent control. Kirkpatrick ignores the fact

---

[3]For convenience, we use the term "residents" to mean one resident per space, regardless of the number of people living in a particular mobilehome.

that under the ordinance, the only spaces subject to rent control are those 25 percent of Laguna Vista's spaces which are not already covered by long-term leases. Thus, while an agreement by 67 percent of the 25 percent who are not covered by leases may be a small minority of the total number of park residents, it is a substantial majority of those residents who are subject to rent control i.e., the 25 percent. Further, the Guidelines provide that when a lease covering an individual space expires and there is a space rent schedule in effect, the individual resident must be provided with an opportunity to consent to the park rent schedule. If the individual declines and the total number of residents who have approved the space rent schedule, including those who were formerly exempted by individual leases, fails to total at least 67 percent of the park residents, then the agreement exemption is lost. (Guidelines, §4.3, subsection (B)(5).) Thus, the Guidelines insure that a space rent schedule and an agreement exemption will be based on the consent of at least two thirds of the park residents who are subject to rent control.

Kirkpatrick complains there is nothing in the ordinance which gives notice that to be counted toward the 67 percent of spaces necessary to exempt a park from rent control, there must be a single termination date.

The Commission's finding a uniform termination date was necessary was based on the explicit language of the Guidelines providing "All of the rents in the park rent schedule must have the same effective and expiration dates" in order to meet the agreement exemption. (Guidelines, § 4.3, subsection (B)(2).) This implements the ordinance's intent the "agreement exemption" be based on a collective agreement of the mobilehome park residents. A collective agreement necessarily implies a single termination date. The ordinance itself states the agreement exemption shall terminate when the agreement expires unless the agreement is extended or renewed (§ 16B.7, subsection (C)), thus implying an intent for one termination date covering the entire park. Further, elsewhere, when referring to individual leases, the ordinance states the individual space will become subject to the rent control when the individual lease expires, thus distinguishing the situation of long term leases with their varying expriation dates from the situation of a space rent agreement with a single termination date.

Kirkpatrick argues "The only difference in effect between individual leases and a single agreement is that the individual leases may have different termination dates." This is not the only difference. There is a significant difference between a lease negotiated between an individual resident and the park

owner where the park owner may have significantly more bargaining power than the individual tenant and a situation where the residents collectively agree with the park owner to a rent schedule. The ordinance in its preamble observes there is a shortage of spaces for manufactured homes and that manufactured homes are costly and risky to move and concludes "The result of these conditions is the creation of a captive market of manufactured home owners. Their immobility, in turn, contributes to the creation of a great imbalance in the bargaining position of the park owners and manufactured home owners in favor of the park owners." (§ 16B.1, subsection (B).) The elimination of this disparity in bargaining power was a motivating force behind the ordinace. (§ 16B.1, subsection (D).) Thus, the underlying policy of the ordinance as well as its express language support a conclusion individually negotiated leases are not to be equated with a collective agreement of the residents.

In conclusion, the ordinance gives notice that pre-existing individually negotiated leases between a park owner and a particular resident which represent more than 67 percent of the park's spaces are not the equivalent to a collective agreement by at least 67 percent of the park residents to a rent schedule covering the entire park. The Commission's adoption of a "consent form" to be signed by the residents does not represent

a retroactive change in the rules.[4] The fact that Kirkpatrick might have offered the residents a different lease had the ordinance not been adopted does not compel a conclusion he made a good faith attempt in reliance on the ordinance to comply with the requirements for an agreement exemption and therefore is entitled to the exemption.

## II

Kirkpatrick contends the Commission erred in classifying Laguna Vista as a "new park." As a result of classifying Laguna Vista as a "new park," the Commission used the first three years of Laguna Vista's operation in arriving at its net operating income (NOI) rather than the NOI of December 1979 in calculating the initial permissive adjustment.

To support his assertion Laguna Vista was not a new park, Kirkpatrick invokes section 16B.8 of the ordinance:

> "Beginning the first month which commences following the one hundred twentieth day after the effective date of this Chapter, no manufactured home park owner shall charge space rent for any manufactured home space in an amount greater than the space rent in effect on December 31, 1979. The space rent in effect on that date shall be known as the "space rent ceiling."

---

[4]Kirkpatrick argues the consent forms were never adopted by the Commission and therefore are not legal force or effect and that further the lack of consent forms cannot be used as a basis for excluding leases signed without consent forms from the calculation of the necessary 67 percent. The Commission has implicitly adopted the consent forms. The leases here were not excluded here because they were not on a consent form but because they did not fit within the agreement exemption.

"If there was no space rent in effect on December 31, 1979, the space rent ceiling shall be the space rent that was charged on the first date that space rent was charged after December 31, 1979." (§ 16B.8.)

This section, however, addresses only the "space rent ceiling" for _individual_ spaces; the NOI is based on the gross income and operating expenses for the _entire_ park. (§ 16B.12.)

The ordinance defines the base year for computing the NOI as follows: "Except as otherwise provided herein, the base year for all manufactured home parks shall be 1979." (§ 16B.11.) The ordinance provides "it shall be presumed that the Net Operating Income produced by a manufactured home park during the base year provided the park owner with a just and reasonable return" and that "park owners shall be entitled to maintain and increase their Net Operating Income from year to year in accordance with the adjustment procedures" contained in the ordinance. (§ 16B.10.) The ordinance also states "For new manufactured home parks, it shall be presumed that the average Net Operating Income for the first three years of operation after the first resident occupies a manufactured home ·rental space therein would provide the park owner with a just and reasonable return." (§ 16B.10.) The ordinance does not otherwise define what is a "new park."

The Guidelines' definition of a new park includes a park built after December 31, 1976 and before December 31, 1979 and

provides for averaging the gross income of the park for the first three years of operation immediately after the first space in the park was rented to calculate the rent rollback and initial adjustment. (§ 4.1, subsection (C)(2).) The Guidelines also provide for a "new park" exemption for the first three years of operation for mobilehome parks built between December 31, 1979 and September 12, 1984 and for those built after September 12, 1984. (§§ 4.1, subsection (C)(1), 4.1, subsection (C)(3).)

The Commission's determination Laguna Vista was a "new park" is based on the Guidelines' definition and is supported by the evidence. Laguna Vista was opened in mid-July 1978. As of December 31, 1979, Laguna Vista was not fully occupied. There were still four spaces (excluding the space Kirkpatrick had reserved for himself) which were not yet occupied.

Kirkpatrick, however, argues the Guidelines do not reasonably implement the ordinance. We disagree.

The ordinance itself states the initial three-year period of operation shall be used to presumptively determine a just and reasonable return on investment, thus indicating an intent that there should be three years of operation before applying the rent control, i.e., until there are three years of operation, the park is "new." Further, the NOI formula requires a fully operational park.

The NOI is based on the gross income of the park "computed . . . at 100% occupancy, plus . . . ." (§ 16B.13, subsection (A).) Thus, a park which was opened in 1979 but not fully occupied would be using a distorted gross income figure in the NOI computation; a figure unrelated to the actual income received. The park's gross operating expenses would also be distorted if the park were not fully occupied.

The ordinance provides for the initial permissive adjustment as follows:

> "A park owner shall be entitled to an initial permissive adjustment gross space rental income equal to the lesser of an eight percent (8%) increase per annum since the base year or an increase equal to the percentage increase in the Consumer Price Index (CPI) from the end of the base year to the date of application for the adjustment.

> "The percentage increase in the CPI shall be calculated by subtracting the CPI reported for November, 1979, from the most recently reported monthly CPI preceding the application and then dividing this remainder by November, 1979, CPI." (§ 16B.9, subsection (B)(1).)

This formula for determining the initial permissive adjustment would become unworkable if the park was not fully occupied in the base year. The Commission gives the following example:

> "(2) Example No. 2: PARK TWO -- OPENED 1979.

> "What if Park Two opened for business in 1979 but was not fully occupied until 1980? Once again, in order for the Commission to apply the formulae contained in the Ordinance, it must be treated as a new park.

"Since it was not fully occupied in 1979, it has a 'gross space rental income' which is below the gross space rental income for a fully occupied park. Therefore, the initial permissive adjustment would be extremely low because it would be increasing the '1979 gross space rental income,' which is completely unrelated to the income it would have derived from a fully occupied park.

"In order to determine the NOI in the 'base year,' it would be necessary to calculate the gross income and operating expenses for the park in 1979. Since the park was not completely leased in 1979, the gross income and the operating expenses would have no relationship to the gross income and operating expenses for the park if it were filled. Since NOI in the base year must be calculated in order to determine the initial NOI adjustment, and since the NOI formula is premised upon the conclusion that the NOI (profit) of the park owner in the base year is indicative of its profit in a free market condition, it is necessary to calculate the NOI is a year in which the park was filled so that both income and operating expenses are indicative of the true common operating expenses of the park in an open market condition. If the initial NOI adjustment for Park Two considered using 1979 as a base year, the true gross income would necessarily be less than the gross income in a full park and the opearting expenses would also be less than the operating expenses of the park treated as a full park. Furthermore, Ordinance section 16.B13A provides that gross income would include gross space rents, 'computed as gross space rental income at 100% occupancy.' It would thus be possible for the owner to dramatically increase his NOI by including gross space rents at 100% occupancy but having operating expenses which only include the cost of operating the park for a fraction of the spaces occupied. The effect of increasing

> the NOI so dramatically in the base year is
> to dramatically, and artificially, increase
> the NOI adjustment."

Further, the initial year of operation may involve costs which are significantly different from later years as the park becomes fully occupied and the operating costs stabilize. This difference is apparent in the instant case. Here, Kirkpatrick's lease for the park property contained a specified amount of rent for the first twelve months of operation. After the first year of operation, not only the basic rent increased, but also the lease required Kirkpatrick to pay a percentage of his gross space rental income to the lessor. The record also does not indicate when the spaces were occupied, i.e., whether all but four spaces were occupied by January 1979 or by the last day of December 1979. Thus, the space rent of the first year did not reflect the space rent of later years. Similarly, the expenses were not the same. For example, during Laguna Vista's first year of operation, the sewer system had to be replaced because it had been improperly installed in the first place. Thus, the expenses in the first year do not necessarily reflect the typical operating expenses.

Apparent in the ordinance is an intent that the space rent ceiling be based on a mobilehome park's ordinary operating expenses and a reasonable space rent. The City Council determined the average of a park's three years of operation

provided a presumption of a fair and reasonable return. They incorporated this presumption into the ordinance and specifically authorized the use of the formula used by the Commission when it adopted the Guidelines. Laguna Vista was a "new park."

III

Kirkpatrick contends the trial court erred in refusing to order the commission to allow him to pass along his land lease costs as operating expenses to the park residents.[5] The Commission contends the trial court erred in ordering it to consider Kirkpatrick's land lease costs. We conclude the Commission properly excluded Kirkpatrick's land lease costs on the basis they are similar to "debt service expenses" which are specifically excluded from normal operating expenses by the ordinance.

In section 16B.14, the ordinance lists operating expenses to be considered in determining net operating income.

---

[5]The Commission contends Kirkpatrick waived this issue because he failed to present evidence to the Commission at the hearing. The record shows there was extensive argument on whether Kirkpatrick's land lease costs could be considered as operating expenses. There was some evidence of the land lease costs presented to the Commission, at least as shown by the lease and Laguna Vista's first years of operation. The Commission determined the land lease costs were not relevant, were not operating expenses within the meaning of the ordinance and refused to consider them. Under these circumstances, where the issue was argued and the Commission excluded consideration altogether, the issue was not waived.

Subsection (A) states "For purposes of this Chapter, the Operating Expenses (OE) of a manufactured home park shall include the following: . . ." (Italics added.) Land lease costs are not specifically included. Subsection (B) of section 16B.14 states "Operating expenses shall not include the following: . . ." (Italics added.) Among the specifically excluded expenses are "debt service expenses." (§ 16B.14, subsection (B)(1).) Subsection (C) states all operating expenses must be reasonable, puts the burden of proving the reasonableness of an operating expense which exceeds the industry norm on a mobilehome park owner, allows the Commission to find any such expense unreasonable and to adjust it to reflect the industry norm or some other comparable standard.

The fundamental goal in interpreting legislation is ascertaining the legislative intent. (Elysian Heights Residents Assn., Inc. v. City of Los Angeles (1986) 182 Cal.App.3d 21, 27.) "In determining such intent, '[t]he court turns first to the words themselves for the answer.' [Citation.]" (Moyer v. Workmen's Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230.) The court attempts to give effect to the usual, ordinary import of the language and seeks to avoid making any language mere surplusage. (Select Base Materials v. Board of Equal. (1959) 51 Cal.2d 640, 645; Honey Springs Homeowners Assn. v. Board of Supervisors (1984) 157 Cal.App.3d

1122, 1136, fn. 11.) If possible, significance should be attributed to every word, phrase, sentence and part of legislation. (Beaty v. Imperial Irrigation Dist. (1986) 186 Cal.App.3d 897, 902.) The various parts of a legislative enactment must be harmonized by considering the particular clause or section in the context of the legislative framework as a whole. (Elysian Heights Residents Assn., Inc. v. City of Los Angeles, supra, at p. 27.)

Here, the ordinance neither specifically includes nor excludes land lease expenses as operating expenses which are to be used in calculating an owner's NOI. The City's intent to exclude land lease costs from calculation of the NOI, can, however, be inferred from the fact the City has specifically excluded "debt service expenses" which are similar to Kirkpatrick's land lease costs, except if increases in debt service expenses are mandated by the terms of a pre-1980 loan, e.g., due to variable interest rates or involuntary refinancing because of a balloon payment. (§§ 16B.14, subsection (B)(1), 16B.14, subsection (A)(11).) As far as park owners who own the land are concerned, the ordinance clearly does not allow the park owner to include as an operating expense the cost of maintaining possession of the land. Increases in the park owner's possessory cost are not includable as operating expenses which may be passed onto park residents unless they are involuntarily incurred by forces beyond the owner's control.

Kirkpatrick's percentage land lease costs reflect his possessory cost, the cost of maintaining his leasehold possession. His lease provides for a basic minimum rent. Additionally, his lease requires him to pay his landlord 15 percent of the first $450,000 of his annual gross income derived from space rentals and 25 percent of amounts received over $450,000. Under his lease, Kirkpatrick has control over the increases in the land lease payments. His increases in the land lease payments are due to his voluntary actions in increasing the space rentals; not due to involuntary factors beyond his control comparable to the involuntary increases in debt service expenses which are permitted by the ordinance. His increases in his land lease costs are similar to the increases in debt service expenses which are specifically excluded from calculation of an owner's operating expenses and NOI. Both are possessory costs, with one representing the cost of maintaining a leasehold possession and the other the cost of maintaining a fee interest.

Nothing in the ordinance indicates an intent that park owners who lease the underlying land are to be treated differently from park owners who own the land as to their possessory costs. Indeed, from the fact the ordinance treats all land-owning park owners similarly (i.e., excluding their possessory costs from operating expenses except in limited

circumstances) despite their disparate possessory costs, it can be inferred the City also intended land-leasing park owners be treated similarly.

Our conclusion is further supported by the City's subsequent amendment of the ordinance. In July 1986, the City added to the list of permitted operating expenses to include increases in rental payments on pre-1980 land lease payments when the increases result from inflation or increases in space rental income. (Ord. No. 86-28.) This new subsection (12) of § 16B.14, subsection (A) provides:

> "Increases in rental payments made on leases of land entered into prior to January 1, 1980. A park owner may, on such terms and conditions as the Commission deems reasonable, include as expenses that portion of the increase in rental payments made by the park owner on a lease of the land occupied by all or a portion of the park where such lease was entered into prior to January 1, 1980, as follows: The park owner may include as expenses an amount not to exceed the increase in such land lease rental payments occurring since the previous Commission-approved rental adjustment for the park where said increase in land lease rental payments is the result of inflation or the increase in the space rental income.
>
> Such increased land lease rental obligations shall be permitted to be considered as an operating expense only where the park owner can show that the terms of the lease are reasonable and consistent with prudent business practice under the circumstances." (Ord. No. 86-28.)

At the same time, the City also amended section 16.14(B)(1) which lists excluded operating expenses to exclude "All debt

service expenses <u>and rental payments made on leases of land,</u> <u>except as provided above</u>." (Ord. No. 86-28, subsection (1)(B), italics added.) In adopting these amendments, the City Council stated "Section 16B.14(B)(1) is a statement of existing law. Section 16B.14(A)(12) shall only be applied prospectively." (<u>Id</u>. at § 3.) The City further stated:

> "This Ordinance is an urgency measure . . . . The City Council of the City of Oceanside hereby declares that facts exist which constitute an urgency, to wit: There is an immediate need to provide the Manufactured Home Fair Practices Commission a clarification with respect to the treatment of land leases so that such clarification can assist the Commission in all hearings for rental adjustments which are ongoing." (Ord. No. 86-28, § 4.)

Under the rules of statutory construction, it is presumed that a legislative body enacts an amendment with an intent to change the law but this presumption may be rebutted when the surrounding circumstances indicate only a clarification of existing law was intended. (<u>Anne B.</u> v. <u>State Bd. of Control</u> (1984) 165 Cal.App.3d 279, 285.) Here, the City expressly stated it was not changing existing law that land lease costs (like debt service expenses) were excluded from the calculation of a park owner's operating expenses except as specifically provided. Before the amendment, there was no provision specifically providing for the inclusion of land lease costs. With the adoption of the amendment, the City, for the first

time, specifically provided for the inclusion of some land lease costs as operating expenses, a provision which was to operate prospectively only.

We conclude the Commission properly refused to include increases in Kirkpatrick's land lease costs as operating expenses to be factored into the NOI formula.

## IV

Kirkpatrick contends we must reverse and remand to insturct the trial court to order the Commission to consider any evidence relevant to a just and reasonable return and not just evidence directed to the factors listed in the ordinance and guidelines. No remand is necessary because the trial court did order the Commission to consider all evidence relevant to a just and reasonable return.

In its oral pronouncement of judgment, the court stated:

> "[I]t seems to me that the purpose of the hearing is to receive evidence from both sides, from all sides, concerning what would be a just and reasonable return, which, of course, would be determinative of the question of fair rental schedule. In that regard, it seems to me that the Commission must consider -- and I underline 'consider' -- all evidence relevant to the question of a just and reasonable return to the landlord.
>
> ". . . . . . . . . . . . . . . . . . . . .
>
> "Yes, I am remanding it to the Commission to in effect consider such evidence as it relates to debt service, among other things, many other things, towards which can be

considered as it relates to just and reasonable return." (Italics added.)

The minute order also reflects this statement: "The Commission must consider all relevant evidence for any increase in the Park Owners [sic] expenses."

### DISPOSITION

The judgment as to the land lease costs is reversed. In all other respects, the judgment is affirmed.

_____
KREMER, P.J.

WE CONCUR: