Filed 5/31/13  Marriage of Heidemann CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of PAUL and JENNIFER HEIDEMANN. | D060843 |
| PAUL HEIDEMANN, | |
| Respondent, | (Super. Ct. No. DN154547) |
| v. | |
| JENNIFER DETRANI, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Thomas Ashworth III, Judge.  Affirmed in part, reversed in part and remanded with directions.

Jennifer DeTrani, in pro. per.; and Dennis Seymour for Appellant.

Stephen Temko for Respondent.

In this marital dissolution action between Paul Heidemann and Jennifer DeTrani, Jennifer appeals from the final judgment determining the division of property and other matters, including child custody and support.[1]  Jennifer contends (1) the trial court erred in apportioning and dividing Paul's ownership interest in a privately held insurance

---

[1]    As is customary in family law cases, we will refer to the parties by their first names for convenience and clarity, intending no disrespect.

brokerage firm (the firm), between community property and Paul's separate property;[2] (2) the court's valuation of Paul's share of the firm was erroneous; (3) the court incorrectly determined Paul's income for purposes of calculating child support; (4) the court erred in denying Jennifer's request to retroactively modify temporary child support; (5) the court erred in ordering the parties to use a privately compensated mediator to develop an annual child sharing calendar; and (6) the court erred in denying Jennifer's request to include her surname as a second middle name for both of the parties' children.  We reverse the portions of the judgment denying Jennifer's request to retroactively modify temporary child support and her request to include her surname as her children's second middle name, and remand for further proceedings on those requests. We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Paul and Jennifer were married in August 2002 and separated in February 2009. They had two children during the marriage—a son born in 2005 and a daughter born in 2006.

---

[2]     Paul filed a motion in this court to seal portions of the reporter's transcript and a subsequent motion to seal portions of appellant's appendix, the parties' briefs, and certain exhibits containing information about the firm that Paul seeks to protect from disclosure. We granted both motions.  As a result, both redacted and unredacted versions of the appellate briefs and appellant's appendix were filed with the unredacted versions filed under seal.  Respondent's appendix and unredacted copies of the pages of the reporter's transcript containing redactions were also filed under seal.  Although this court cannot file a confidential or sealed opinion, we have endeavored to discuss the relevant facts in sufficiently general terms to maintain their confidentiality.  However, it is impossible to meaningfully discuss the issues in this appeal involving Paul's membership in the firm without some reference to information falling within the scope of Paul's sealing motions.

Jennifer graduated from college and law school and practiced law for several years until shortly after she married Paul. She quit working to focus on remodeling the family home and to be a stay-at-home mother. She resumed practicing law after she and Paul separated, and was working part time for a family law attorney at the time of trial.[3]

Paul graduated from college with a bachelor's degree in political science in 1991. In 1994 he began employment with John Burnham & Company (Burnham), an insurance brokerage business. Union Bank acquired Burnham after Paul and Jennifer married. In September 2007, Paul left Union Bank and accepted an offer to join the firm. Approximately 60 percent of Paul's Union Bank clients followed Paul to the firm, and between 70 and 80 percent of those clients had been his clients before he married Jennifer.

The firm extended a "premium offer" to Paul to purchase twice the ownership interest usually offered to new members because of his stature in the community, his book of business, and his expertise in the construction practice area. Under the firm's offer, Paul was paid a salary plus a percentage of an annual "principal's bonus" and monthly draws against profits based on his ownership percentage. Paul was also offered the position of principal construction practice group leader because of his expertise in the construction field.

To acquire his ownership interest in the firm, Paul was required to sign the firm's Fourth Amended Operating Agreement (the Operating Agreement), which sets forth the buy-in process applicable to every owner joining the firm. Under the Operating

---

[3]     Jennifer was laid off from that position during trial.

Agreement, the firm is entirely owned by members who work for the firm. New owners buy into the firm by purchasing the interests of departing owners or portions of the interests of existing owners. A new owner's purchase of a departing owner's interest is generally financed through a promissory note payable to the departing owner in monthly installments over a 12-year period. Thus, two benefits of purchasing an ownership interest in the firm are that (1) the owner builds equity in the firm over time by paying down the note financing the purchase; and (2) upon retirement, the owner receives a 12-year stream of income by taking a promissory note for the sale of his or her interest to a new owner.

The purchase price of Paul's initial interest in the firm was based on an annual appraisal of the firm by Reagan Consulting, Inc. (Reagan), an independent firm with expertise in valuing businesses.[4] Paul signed a promissory note reflecting a bank loan for the down payment on his ownership interest, and he and Jennifer signed a promissory note payable to a departing owner for the balance of the purchase price. Under the Operating Agreement, the firm made the note payments after automatically deducting the amount of the payments from Paul's monthly profit draw. The deduction of the note payments from Paul's monthly draw was mandatory and the only way Paul could finance the purchase of an interest in the firm.

---

[4]     The Operating Agreement provides that the price to be paid for a membership interest is the fair market value of the member's percentage interest, "which fair market value shall be determined annually by an appraiser familiar with the insurance industry . . . ."

In May 2008, Paul's ownership interest in the firm was adjusted to a lower percentage as the result of the firm's merger with another firm. In 2009 Paul purchased an additional interest in the firm that was 100 percent financed through a promissory note and a loan from the firm for the down payment. The payments on these loans were also made from mandatory deductions from Paul's monthly profit draw. After that purchase, Paul's ownership percentage was again adjusted as a result of the firm's consolidation with a related firm and a new owner being brought into the firm. Eleven months after he and Jennifer separated, Paul purchased an additional interest in the firm.

Paul filed a petition for dissolution in February 2009. In March 2009 Jennifer filed an order to show cause (OSC) seeking orders regarding child support and custody, spousal support, use of the residence, and attorney fees and costs. On the parties' stipulation, the court ordered Paul to pay Jennifer spousal support of $3,000 per month and child support of $3,000 per month. The court reserved jurisdiction over support retroactive to March 13, 2009, the date Jennifer filed her OSC. The court also reserved jurisdiction over the promissory note payments made from Paul's monthly profit draw and over Paul's other future profit distributions and bonuses. On May 20, 2010, Jennifer filed an OSC seeking modification of child and spousal support and attorney fees and costs. In June 2010 Paul filed an OSC requesting the court to adopt the recommendations of a child custody and visitation mediator and to use the date of separation as the valuation date of his equity interest in the firm.

In September 2010, the parties stipulated to an order appointing retired Judge Thomas Ashworth, III to preside over the case as a privately compensated temporary

judge. The stipulation and order stated: "The parties are vacating the existing OSCs and resetting the OSCs and trial and everything else in front of Judge Ashworth."

A trial before the court (Judge Ashworth) was held over seven days beginning on November 30, 2010 and ending on February 16, 2011. On May 11, 2011, the court issued a final statement of decision addressing the contested issues, and entered judgment based on the statement of decision on September 2, 2011. We will include additional relevant facts in our discussion of the legal issues.

DISCUSSION

I. *Division of Ownership Interest in the Firm*

Jennifer contends the court erred by not allowing her to retain a 50 percent equity interest in the interest in the firm that Paul acquired during marriage. In its statement of decision the court concluded: "When considered as a whole, [Paul's] interest in the firm has only a small community component. [Paul] had an established clientele with John Burnham prior to marriage. The firm ownership interests were acquired shortly before separation and encumbered up to 100% of their appraised value. Any significant future value, which is at best speculative, will be earned by [Paul's] post-separation efforts."

To calculate the value of the community interest in the firm, the court relied on a Reagan appraisal that determined the total fair market value of the firm as of December 31, 2009. The court calculated the ownership percentage of the firm's total value that Paul held at the time of separation and subtracted from that figure the "date of separation related debt" owed for the purchase of Paul's interest in the firm. The court found the resulting figure was the net value of the community interest in the firm at the

6

time of separation. The court awarded Paul that interest in the firm and equalized the distribution of community property by awarding Jennifer the family residence, which the court found to have a net value that was almost $20,000 more than the net value of Paul's interest in the firm. The court ruled that the interest in the firm that Paul purchased after separation was Paul's separate property.

Jennifer contends the court should have divided the community interest in the firm in kind by awarding her a 50 percent equity interest in Paul's ownership interest. She argues that a proper division of the community interest in the firm would entitle her to receive half of Paul's profit draws as long as Paul holds that interest, and half of the income stream produced by Paul's sale of that interest upon retirement from the firm.[5] She contends that the ownership interest in the firm is a vested property right equivalent to a vested stock option or pension that becomes an asset of the community when acquired during marriage.

Family Code section 2550[6] requires the trial court in marital dissolution proceedings to value and equally divide the parties' community property estate, unless the parties have agreed otherwise.[7] A spouse's time, skill, and labor are community assets

[5]     Jennifer does not expressly contest the court's finding that the interest in the firm that Paul purchased after separation is Paul's separate property. However, she does not exclude that interest in claiming entitlement to half of Paul's profit draws and income from the sale of his interest in the firm upon retirement.

[6]     All subsequent statutory references are to the Family Code unless otherwise specified.

[7]     Section 2550 provides: "Except upon the written agreement of the parties, or on oral stipulation of the parties in open court, or as otherwise provided in this division, in a

and his or her earnings during marriage are community property, but after separation, earnings and accumulations of a spouse are separate property. (§§ 760, 771, subd. (a).) "The trial court must characterize the property for purposes of this division as separate, community, or quasi-community . . . .  In characterizing a benefit, courts consider all relevant circumstances." (*In re Marriage of Sivyer-Foley & Foley* (2010) 189 Cal.App.4th 521, 525-526 (*Sivyer-Foley*); § 771).  "The word 'earnings' is broader in scope than 'wages' and 'salary.' " (*In re Marriage of Imperato* (1975) 45 Cal.App.3d 432, 437.)

"The trial court has broad discretion to determine the manner in which community property is divided, although, absent an agreement, it must be divided equally. [Citations.]  Accordingly, we review the trial court's judgment dividing marital property for an abuse of discretion." (*Sivyer-Foley*, *supra*, 189 Cal.App.4th at p. 526.)  Generally, "the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598.)  "In addition, we review the trial court's factual findings regarding the character and value of the parties' property under the substantial evidence standard.  [Citations.]  Ultimately we review characterization issues independently because they are a mixed question of fact and law involving application of the law to facts." (*Sivyer-Foley*, *supra*, at p. 526.)

---

proceeding for dissolution of marriage or for legal separation of the parties, the court shall, either in its judgment of dissolution of the marriage, in its judgment of legal separation of the parties, or at a later time if it expressly reserves jurisdiction to make such a property division, divide the community estate of the parties equally."

The court may use any of several methods of effecting an equal division of community property, including division in kind or "asset distribution or cash out." (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 88 (*Cream*).) "The asset distribution or cash out method involves distributing one or more community assets to one spouse and other community assets of equal value . . . to the other. When . . . this method is used, section [2552] confers upon the court the responsibility to fix the value of assets and liabilities in order to accomplish an equal division." (*Ibid.*)

Whatever method the trial court uses in apportioning a particular asset or property between community property and separate property for the purpose of dividing the property in a marital dissolution action, the "superior court must arrive at a result that is 'reasonable and fairly representative of the relative contributions of the community and separate estates.' " (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 187.) "[W]hen the court concludes that property contains both separate and community interests, the court has very broad discretion to fashion an apportionment of interests that is equitable under the circumstances of the case. [Citations.] The court is not bound by a particular method of allocation. Rather, the court should divide the property ' "by whatever method or formula will 'achieve substantial justice between the parties.' " ' " (*In re Marriage of Gray* (2007) 155 Cal.App.4th 504, 514.)

The essential issue raised by Jennifer's challenge to the court's division of community property is whether the court erred in deciding that any increases in the equity value of Paul's interest in the firm or profit draws he receives after separation are his separate property, and therefore, Jennifer's community property share of Paul's interest in

9

the firm is limited to half of its equity value in 2009.  We find no error in the court's division of community property.

Jennifer's claim to a 50 percent share of Paul's interest in the firm might have merit if the community's purchase of that interest were strictly an investment in a business that neither spouse was actively involved in operating.  However, Paul's opportunity to buy an ownership interest in the firm and his entitlement to the benefits of the profit draw and future income stream from the sale of his interest were entirely the result of his book of business and his ability to produce profits for the firm as a working member of the firm. The Operating Agreement requires each member to devote his or her "full attention and effort to the business of [the firm], unless, with the approval of the Board of Directors, a [m]ember elects to reduce his or her commitment to less than a full time effort, in which event [the member's ownership interest] would be reduced . . . ."  The firm's chief financial and operating officer (CFO/COO) testified that if a member of the firm underperforms, his or her ownership percentage can be reduced, and he was aware of three instances of ownership percentages being reduced for underperformance.  He further testified that Paul had not been threatened with a reduction of his ownership interest, and that the percentage of the firm a member owns is set over time based on the member's contribution to the growth of the firm.  The fact that after separation Paul was offered and purchased an additional ownership interest in the firm evidences that he was contributing to the growth of the firm and, accordingly, to the profits resulting in his monthly profit draws.  Thus, Paul's post-separation profit draws are sufficiently tied to his

work performance and to the revenue he personally generates for the firm to be properly deemed the fruit of his own time, skill, and effort and, as such, his separate property.

This case is analogous to *In re Marriage of Behrens* (1982) 137 Cal.App.3d 562 (*Behrens*), in which the Court of Appeal held that a husband's account in the profit-sharing plan of a corporation of which he was a key employee and shareholder was community property immediately before the parties separated, but the employer's post-separation contributions to the account that increased its value were the husband's separate property. (*Id.* at p. 577.) In rejecting the wife's argument that the post-separation contributions were community property because they were based on profits to which the community as a shareholder had prior claim, the *Behrens* court distinguished between undistributed *corporate* earnings that cause appreciation in the value of corporate shares, and the earnings of a *shareholder-employee* in the form of " ' "salary, bonuses, *and other forms of benefits*." ' " (*Ibid.*) Because the contributions to the husband's profit-sharing account were intended and received as a form of compensation paid to shareholder-employees, the *Behrens* court held that the post-separation contributions were the husband's separate property. (*Ibid.*) The profit draws that Paul receives from the firm are analogous to the profit-sharing distributions to the husband in *Behrens*, as both are essentially a form of employment compensation based on the recipient's status as part owner who works for the employer. Like the post-separation profit-sharing payments in *Behrens*, Paul's post-separation profit draws from the firm are separate property.

11

Moreover, the firm made Paul a premium offer—i.e., an offer to purchase twice the ownership interest in the firm than that typically offered to new members—in large part because of his book of business, 70 to 80 percent of which was the result of his time, skill, and efforts before marriage. Although the court did not expressly treat the book of business itself as an item of property to be apportioned and divided between the community estate and Paul's separate property estate, the court reasonably viewed its separate property character and the major role it played in Paul's acquisition of his ownership interest in the firm as relevant circumstances supporting its award of the entire community interest in the firm to Paul with an equalizing distribution of the residence to Jennifer.[8]

Jennifer argues that Paul's future income stream from the sale of his interest in the firm upon retirement should be viewed, and divided in kind, as a pension that is part community property. However, "in disposing of the community interest in a pension plan in marital dissolution actions, the trial court possesses broad discretion to choose to divide it in kind between the spouses, *or* to award it to the employee spouse at its present

---

[8]     Courts in other jurisdictions have held that a book of business similar to Paul's is a marital asset subject to division and distribution in dissolution proceedings. An Arizona appellate court noted that although the husband insurance agent was an employee of an insurance company and did not own the business, he had a right to commissions on the renewals of the policies he had procured, and that the renewal value of existing policies is termed a "Book of Business" in the insurance industry. (*Pangburn v. Pangburn* (Ariz. 1986) 731 P.2d 122, 123 (*Pangburn*).) The *Pangburn* court held that the trial court had discretion to include the husband's book of business in the community estate. (*Id.* at p. 125; see also *Moll v. Moll* (2001) 722 N.Y.S.2d 732, 737 [husband's book of business as a stockbroker and financial advisor is a marital asset subject to equitable distribution].)

value and accomplish an equal division of community property by an offsetting award of other assets." (*In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 746.)

Even if we were to view Paul's future income stream from his eventual sale of his interest in the firm as a pension that should have been divided in kind, Jennifer would not be entitled to 50 percent of that benefit. When the total number of years served by an employee-spouse is a substantial factor in computing the amount of retirement benefits he or she will receive, the trial court appropriately applies the "time rule" in dividing those benefits between community and separate property. (*In re Marriage of Gowan* (1997) 54 Cal.App.4th 80, 88; *In re Marriage of Judd* (1977) 68 Cal.App.3d 515, 522.) "Generally, under the time rule, the community is allocated a fraction of the benefits, the numerator representing length of service during marriage but before separation, and the denominator representing the total length of service by the employee spouse. That ratio is then multiplied by the total benefit received to determine the community interest." (*In re Marriage of Steinberger* (2001) 91 Cal.App.4th 1449, 1460.) The length of Paul's "service" with the firm during marriage but before separation was approximately 17 months, ending in February 2009. His total length of service with the firm remains to be seen, but will likely be in the range of 15 to 20 years. Thus, it is not clear that Jennifer would realize a greater benefit from an in-kind division of the community interest in Paul's post-retirement income stream under the time rule than she realized by the court's awarding her the marital residence as an equalizing distribution of community property.

13

In any event, given the evidence that Paul built 70 to 80 percent of the book of business he brought to the firm before marriage and that his post-separation profit draws and corresponding equity increases in his ownership share of the firm are directly tied to the time, skill and effort he devotes to working for the firm, the court reasonably found there was "only a small community component" to Paul's interest in the firm and that any significant value in Paul's interest would be earned by his post-separation efforts. The court did not abuse its discretion in awarding Paul the entire community interest in the firm and equalizing the distribution of community property by awarding Jennifer the family residence.

## II. *Valuation of Community Interest in The Firm*

Jennifer contends the court erred in rejecting the analysis of the value of the community interest in the firm that she presented at trial. Using primarily a capitalization of excess earnings valuation method, but also considering a capitalized cash flow method, her business appraisal expert, John Cooper, valued the community interest in the firm as of February 2009 at a figure that was about seven times higher than the value that the court ultimately found.

"The trial court possesses broad discretion to determine the value of community assets as long as its determination is within the range of the evidence presented. [Citation.] The valuation of a particular asset is a factual question for the trial court, and its determination will be upheld on appeal if supported by substantial evidence in the record. [Citation.] All issues of credibility are for the trier of fact, and all conflicts in the evidence must be resolved in support of the judgment. [Citation.] The trial court's

14

judgment is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670 (*Nichols*).)

"In the exercise of its broad discretion, the trial court 'makes an independent determination of value based upon the evidence presented on the factors to be considered and the weight given to each. The trial court is not required to accept the opinion of any expert as to the value of an asset.' [Citations.] Differences between the experts' opinions go to the weight of the evidence. [Citations.] Rather, the court must determine which of the recognized valuation approaches will most effectively achieve substantial justice between the parties." (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 632 (*Duncan*).)

The court based its valuation of the community interest in the firm on the 2009 Reagan appraisal of the firm and the trial testimony of Kevin Stipe, an officer and principal of Reagan. Jennifer argues that the Reagan appraisal is defective because it did not factor in business goodwill, which itself is property subject to valuation and division in a dissolution action.

Business and Professions Code section 14100 defines the goodwill of a business as the expectation of continued public patronage. Because a community interest can only be acquired during marriage, "the value of the goodwill must exist at the time of the dissolution and that value must be established without dependence on the potential or continuing net income of the professional spouse." (*In re Marriage of King* (1983) 150 Cal.App.3d 304, 309.) Although the court may not value business goodwill by a method

15

that factors in the post-separation efforts of either spouse, " 'a proper means of arriving at the value of such goodwill contemplates any legitimate method of evaluation that measures its present value by taking into account some past result.' [Citation.] In this regard, the value of goodwill existing at the time of marital dissolution is separate and apart from the expectation of the spouses' future earnings." (*Duncan*, *supra*, 90 Cal.App.4th at pp. 633-634.)[9]

Stipe testified that goodwill is considered to be one of the intangible assets of the firm that is part of the value of earnings that is "pooled" in the Reagan appraisal with the other intangible assets, although it is not separately identified. The 2009 Reagan appraisal explained, under the heading "Description of Valuation Tests," that Reagan focused on income and market approaches for evaluating the firm rather than an asset based approach because the firm is "an insurance broker that derives most of its value from intangible assets (i.e., customer lists, restrictive covenants and goodwill)[.]" The firm's CFO/COO testified that what the Reagan appraisal essentially values is the firm's goodwill because most of the firm's value is goodwill. When he testified that goodwill is based on the present value of future earnings and not past earnings, the court interjected, "Of course future earnings are a projection based on past earnings." In accordance with the court's observation, the Reagan appraisal stated: "In preparing our forecast of future earnings, we have used the pro forma twelve month period ended December 31, 2009 as a base year for revenue and expense projections. . . .We have looked closely at the unique

---

9    However, *Duncan* also noted that "[v]aluing goodwill necessarily takes into consideration future income because the [statutory] definition of 'goodwill' is 'expectation of continued public patronage.' " (*Duncan*, *supra*, 90 Cal.App.4th at p. 634, fn. 12.)

characteristics of [the firm's] *past operating results* and received input from management as well as our own judgment to develop projections for revenue growth." (Italics added.) Thus, the Reagan appraisal properly factored in goodwill as an intangible asset of the firm in valuing the firm (and, accordingly, the community interest in the firm), and properly measured its present value by taking into account past results.

Jennifer argues that the value of the community interest in the firm cannot be determined by use of a "buy-sell formula" because that approach does not address or account for the ownership distributions (i.e., profit draws) received before retirement, or the post-retirement stream of income from the sale of the interest upon retirement. We construe Jennifer's reference to a "buy-sell formula" to mean the firm's use of the Reagan appraisal to determine the price an incoming member will pay for his or her ownership percentage of the firm, in accordance with the buy-sell provisions of the firm's Operating Agreement.

We disagree that the Reagan appraisal failed to account for profit distributions to owners or the income owners will receive from future sales of their ownership interests. The price an owner pays for an ownership percentage of the firm is that percentage of the firm's total appraised value, which consists mostly of the value of the firm's goodwill – i.e., expectation of continued patronage. Thus, the purchase price reflects the purchaser's expectation of the firm's *future* earnings (based on *past* performance), which will be the source of any future profit draws the owner will receive, as well as his or her income stream from the sale of the ownership interest upon retirement. Accordingly, the court's valuation of the community interest in the firm based on the Reagan appraisal sufficiently

17

accounted for the expectations of annual ownership distributions until retirement and a post-retirement stream of income from the sale of the interest upon retirement.

As for the buy-sell aspect of the Reagan appraisal, there is no hard and fast rule against using an appraisal performed for the purpose of establishing value under a buy-sell agreement to determine the value of a community property interest in a business.  As noted in *In re Marriage of Iredale & Cates* (2004) 121 Cal.App.4th 321, regarding the valuation of a professional practice, "the particular circumstances of each case, and each professional practice, will vary and call for different methods of valuation."  (*Id.* at p. 328.)  Generally, in valuing a professional practice for purposes of dividing community property, a trial court should determine the value of (1) fixed assets such as cash, furniture, equipment, and supplies; (2) other assets including accounts receivable and collectible costs advanced; (3) goodwill of the practitioner spouse in the professional business as a going concern; and (4) liabilities of the practitioner related to the business.  (*Id.* at p. 327.)  Although the Reagan appraisal is done annually for the purpose of determining the price at which interests in the firm will be bought and sold, it substantially complies with the above general requirements for valuing an interest in a professional business, because it takes into account the firm's tangible (i.e., fixed) and intangible assets, goodwill, and long-term liabilities.[10]

_____

[10]    Jennifer contends there is no "professional goodwill" in this case because Paul is not a professional.  However, regardless of whether it is called "*professional* goodwill" or simply "goodwill," Paul's book of business is equivalent to the goodwill of an attorney spouse in his or her professional business as a going concern because both represent the expectation of future patronage from clients as the result of the development of business relationships.  In *Moll v. Moll*, *supra*, 722 N.Y.S.2d 732, the appellate court observed that

In *Nichols*, the Court of Appeal stated that in deciding whether to use a formula set forth in a buy-sell agreement to value a spouse's interest in a professional business, "the trial court should consider (1) the proximity of the date of the agreement to the date of separation to ensure that the agreement was not entered into in contemplation of marital dissolution; (2) the existence of an independent motive for entering into the buy-sell agreement, such as a desire to protect all partners against the effect of a partnership dissolution; and (3) whether the value resulting from the agreement's purchase price formula is similar to the value produced by other approaches." (*Nichols*, *supra*, 27 Cal.App.4th at p. 672.)

The first factor has no relevance in this case because there is no evidence that Paul joined the firm and entered into its Operating Agreement (signed by all members of the firm) in contemplation of marital dissolution. The second factor weighs in favor of the court's use of the Operating Agreement's valuation formula because the firm unquestionably has independent motives for requiring all of its members to enter into its Operating Agreement that have nothing to do with the possibility members may go through marital dissolution proceedings. Regarding the third factor—whether the value resulting from the buy-sell agreement's purchase price formula is similar to the value

the stockbroker husband's " 'book of business' is not the customer accounts maintained by the brokerage house. It is the *personal or professional goodwill* acquired by the [husband] . . . ." (*Id.* at p. 773, italics added.) The same reasoning applies to Paul's book of business—i.e., it reflects his personal and professional goodwill in the business of the firm as a going concern. (See *Duncan*, *supra*, 90 Cal.App.4th at p. 626 [husband's investment advisory business was properly valued as of the date of separation as a professional practice]; *In re Marriage of Rives* (1982) 130 Cal.App.3d 138, 149 [queen bee business that depended on husband's skill, experience, and reputation in the industry resembled a professional practice with goodwill value component].)

produced by other approaches—Jennifer points to the difference between the value of the community interest based on the Reagan appraisal and the value her expert Cooper calculated using capitalization of excess earnings and capitalized cash flow approaches.

The capitalization of excess earnings method of determining the goodwill value of a spouse's business focuses on the earning power of a business to determine the rate of return predicted earnings will yield in light of the risks involved to attain the earnings. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 200.) Generally, the excess earnings method compares the earnings of the spouse in question with the earnings of a peer whose performance is average. (*Ibid.*) "To make this comparison, courts may . . . 'determine the annual salary of a typical salaried employee who has had experience commensurate with the spouse . . . .' [Citation.] Alternatively, courts may apply the 'similarly situated professional' standard, under which reasonable compensation is based on ' " ' " 'the cost of hiring a nonowner outsider to perform the same average amount that other people are normally compensated for performing similar services . . . .' " ' " ' " (*Ibid.*)

The next step in this approach is to deduct from the spouse's average net pretax earnings a fair return on the net tangible assets of the spouse's business. (*In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1095, fn. 1.) " 'Then, one determines the "excess earnings" by subtracting the annual salary of the average salaried person from the average net pretax earning[s] of the [spouse's] business or practice remaining after deducting a fair return on tangible assets. Finally, one capitalizes the excess earnings over a period of years by multiplying it by a factor equal to a specific

20

period of years, discounted to reflect present value of the excess earnings over that period. The period varies according to factors such as the type of business, its stability, and its earnings trend.' " (*Ibid.*)

In his application of the capitalization of excess earnings method, Cooper determined that the "reasonable compensation" for a nonowner of the firm doing Paul's job was $150,000 per year. Using a capitalization rate of 45 percent, Cooper calculated the "marital value" of the community interest in the firm on the date of separation. Cooper also used a capitalized cash flow method of appraising the community interest in the firm. Under that method, he determined the marital value of the community interest in the firm on the date of separation and on November 1, 2010. Taking both valuation methods into consideration, he concluded that a figure about seven times greater than the court's valuation was a reasonable number for the marital value of the community interest in the firm on the date of separation. Cooper also calculated the value of the community interest in 2032, reduced to its present value, based on the assumption that the firm would grow in value at a rate of 10 percent per year.

Regarding Cooper's capitalization of excess earnings approach, Stipe testified that he did not agree with Cooper's use of $150,000 per year as reasonable compensation for a nonowner doing Paul's job. Stipe believed Paul's earnings should be compared to an employee performing at Paul's level and "not somebody in a little agency in Bakersfield." He testified that under the firm's compensation formula, a nonowner operating at Paul's level of performance would earn $390,000 per year, and that reasonable compensation for

Paul was in the neighborhood of $400,000 per year because Paul was the firm's eighth largest sales producer for 2009 with a substantial book of business.[11]

Stipe also disagreed with Cooper's projected annual growth rate of 10 percent for the firm. He testified that even if the firm were to grow at that rate, the ownership base would expand and there would be a substantial reduction in each owner's percentage. Consequently, in 10 years at that growth rate, Paul's ownership interest would be a fraction of its present percentage. Stipe observed that if the value of Paul's interest grew to the figure Cooper projected, the value of the entire firm at that time would be a figure in the hundreds of millions that, in Stipe's words, "just seems really off."

In response to questioning by the court, Stipe confirmed that if his figure for reasonable annual compensation ($400,000) for a peer doing Paul's job were used in Cooper's capitalization of excess earnings formula instead of Cooper's figure of $150,000, the value of the community interest in the firm would be less than the amount owed on the purchase notes. Cooper conceded that even if $240,000 were used as the reasonable compensation figure, the value of the community interest would be would be less than the amount owing on the notes. Regarding his alternative capitalized cash flow formula, Cooper testified that if $240,000 were used as the reasonable compensation figure in that formula, the value of the community interest in the firm would be "just about be above water" in terms of its positive value, and that if the reasonable

_____

[11]    The firm's CFO/COO testified that if Paul worked for the firm as a nonowner and had a similar book of business, he would earn $240,000 per year.

22

compensation figure were $300,000, the value of the community interest would be "just below water"—i.e., less than the debt owed for the purchase of the interest.

In its statement of decision, the court found that Cooper's use of $150,000 as the reasonable annual compensation figure in his capitalization of excess earnings formula was not appropriate. The court stated that if Cooper "ha[d] used a more reasonable figure in the $230,000 to $300,000 range, there would have been no positive value [of the community interest the firm]." The court was entitled to accept Stipe's reasonable compensation analysis over Cooper's. (*Duncan*, *supra*, 90 Cal.App.4th at p. 632 ["Differences between the experts' opinions go to the weight of the evidence."].)

Given the court's reasonable compensation findings, we conclude that the third factor to be considered in determining whether to use a formula in a buy-sell agreement to value a spouse's interest in a business (whether the value resulting from the agreement's purchase price formula is similar to the value produced by other approaches) also supports the court's use of the Operating Agreement's valuation formula. This factor supports the court's use of the annual Reagan appraisal performed under the Operating Agreement, because the Reagan appraisal actually results in a greater value than the value resulting from either the capitalization of excess earnings formula or the capitalized cash flow formula, when the court's reasonable compensation findings are used in those formulas. The Reagan appraisal and Stipe's testimony constitute substantial evidence supporting the court's determination of the value of the community interest in the firm. Because the court's value determination was within the range of the evidence, the court

acted within its broad discretion in valuing that asset. (*Nichols*, *supra*, 27 Cal.App.4th at p. 670.)

### III. *Valuation Date*

Jennifer contends the court erred in using the December 31, 2009 Reagan appraisal to determine the value of the community interest in the firm instead of using the December 2010 appraisal. After the close of evidence at trial, the parties submitted written closing argument to the court. In her closing rebuttal, Jennifer stated, "This Court should order Paul to produce a copy of the Reagan Report for 2010 or obtain the valuation number. As an owner at [the firm] and based on the timing of the release of the report as detailed by Kevin Stipe and Hal Dunning at trial, Paul should have a copy of the Reagan Report for the year ended December 2010 by now. The Court should then subtract the related 'debt' on the date of Judgment."[12]

Noting that Jennifer waited until her closing rebuttal statement to request an order for him to produce the 2010 Reagan appraisal of the firm, Paul argues it was Jennifer's obligation to seek the 2010 Reagan appraisal in discovery and enter it into evidence; it was not the court's duty to order him to produce it. We agree.

---

[12] In her argument heading in her opening brief Jennifer asserts that the court should have used the date of *judgment* as date of valuation. Likewise, in her written closing argument to the trial court, she argued that the date of valuation, if the community interest in the firm is not divided in kind, should be the date of judgment, noting that "Paul provided no evidence on date-of-judgment valuations." However, she actually argues in her opening brief that the community interest in the firm should have been valued as of the time of *trial*, which, as noted occurred between November 30, 2010 and February 16, 2011. Judgment was entered on September 2, 2011.

Section 2552, subdivision (a) provides, in relevant part, that "[f]or the purpose of division of the community estate upon dissolution of marriage or legal separation of the parties, . . . the court shall value the assets and liabilities as near as practicable to the time of trial." It was not practicable for the court to value the firm as of the time of trial based on the December 2010 Reagan appraisal because neither party sought to admit that appraisal in evidence or requested the court to order its production during trial, even though the close of evidence did not occur until mid-February 2011. The trial court generally has no sua sponte duty to order the production of evidence during trial. (See *Bennett v. Municipality of Anchorage* (Alaska 2009) 205 P.3d 1113, 1118 [court had no independent duty to order prosecution in domestic violence case to produce all available evidence regarding a prior incident; court's only duty was to evaluate the relevance and potential prejudice of the evidence based on the record before it].) A *party* has the burden of proof as to each fact that is essential to a claim that he or she is asserting (Evid. Code § 500), and " '[b]urden of proof' means the obligation of a *party* to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid. Code § 115, italics added.) Although Jennifer sought a division of the community interest in the firm in kind at trial, Paul made it clear before trial that he sought a distribution or cash out division of that asset based on its value as established by the 2009 Reagan appraisal.[13] In claiming that a later valuation date was appropriate,

---

[13] Paul asserted that position in his "Supporting Declaration Re Alternate Valuation Date . . . " filed in June 2010.

25

Jennifer bore the burden of proof as to value on such later date. The trial court did not err in failing to order Paul to produce evidence of the value of the firm at the time of trial.

IV. *Income For Purposes of Determining Child Support*

A. Profit draws

Jennifer contends the court erred in refusing to include Paul's monthly profit draw as income for purposes of calculating his child support obligation. As noted, the firm automatically deducts from Paul's monthly profit draw the amount necessary to make the note payments for his purchases of interests in the firm, and the deduction of those payments is mandatory under the Operating Agreement.

We review a child support order for abuse of discretion and, in doing so, determine whether substantial evidence supports the factual findings made in connection with the order. (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 730.) In applying the abuse of discretion standard, we do not substitute our judgment for that of the trial court; we consider only whether any judge reasonably could have made the order. (*Id.* at pp. 730-731.) However, the court must follow established legal principles in exercising its discretion, and we apply the independent or de novo standard of review in determining whether it did so. (*Ibid.*) We also apply de novo review to issues of statutory construction and questions of law presented on undisputed facts. (*Id.* at p. 732; *In re Marriage of Zimmerman* (2010) 183 Cal.App.4th 900, 906-907; *In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1443 (*Blazer*).)

In arguing that Paul's monthly draws must be included in his income for purposes of calculating child support, Jennifer mainly relies on *In re Marriage of Kirk* (1990) 217 Cal.App.3d 597 (*Kirk*) for the proposition that a parent's voluntary diversion of income for purpose of repaying debt should not be deducted from his or her income for purposes of child support. The husband and father of four children in *Kirk* was the principal owner and controlling shareholder of a corporation that operated a car dealership. (*Id.* at p. 600.) After he and his wife separated, he took a loan from the corporation and used it for vacations and other personal pleasures. (*Ibid.*) The husband later entered into an employment agreement with new owners of the corporation that provided for repayment of his debt to the corporation in the amount of $572,000. (*Ibid.*) The mechanism for the repayment was that the corporation paid the husband an annual bonus in monthly installments of $4,450, which were automatically used to reduce his debt. In addition to the bonus installments, the husband was paid a regular salary of $5,000 per month. (*Id.* at pp. 600-601.) The trial court excluded the bonus installment payments from the husband's income for the purpose of calculating child support because they were not available for his living expenses or for child support. (*Id.* at p. 601.)

The *Kirk* court decided the trial court erred "in failing to consider that the only rational inference derivable *from the paperwork before the court* was that [the shift of the bonus payments from the husband's control by automatic payments to the creditor corporation] was a *voluntary diversion* of income to pay debt, resulting in deprivation of funds for child support. The law does not permit this." (*Kirk*, *supra*, 217 Cal.App.3d at p. 607, italics added; see also *In re Marriage of Berger* (2009) 170 Cal.App.4th 1070

27

[salary that father having substantial wealth *voluntarily* deferred to preserve his company's capital must be included in his income for purposes of child support].) However, although the *Kirk* court reversed the child support order, it remanded the matter for further consideration of whether the diversion of the husband's income for repayment of his debt was truly voluntary, stating: "It is conceivable that [the husband] had no choice in the matter, that if he had declined to enter into the special bonus provision he would not have been employed, and hence that the shift of income was in fact not 'voluntary' with [the husband] as we have presumed above. [The husband's] counsel argued as much to the trial court. There was, however, no substantial *evidence* before the court to support this conclusion, and as a matter of fact the trial court did not enunciate that conclusion. On rehearing, the trial court will be entitled to consider additional evidence bearing upon the true nature of [the husband's] employment agreement." (*Kirk, supra*, at p. 607.)

Thus, *Kirk* tends to support Paul's position that his monthly profit draws are properly excluded from his income for purposes of child support because the use of the draws to pay down the debt he incurred to purchase his ownership shares of the firm is *mandatory* rather than *voluntary*. The *Kirk* court's direction to the trial court on remand plainly suggested that if the husband could establish by substantial evidence that the diversion of his bonus payments to pay his debt was involuntary—i.e., that he had no choice in the matter—the trial court would have discretion to exclude the bonus payments from income for purposes of calculating child support. Here, the evidence establishes that Paul joined the firm as an owner during the marriage and had no choice but to

28

purchase his interests in the firm through the procedure set forth in the Operating Agreement, which requires that his profit draws automatically be used to make monthly payments on his purchase notes until they are paid off. Because the deduction of the note payments is not voluntary, *Kirk* does not support the inclusion of the profit draws in Paul's income for purposes of child support.

In its statement of decision, the trial court explained its decision to not include the profit draws as income for purposes of support as follows: "Over the past 3 years, the note payments, which are direct deductions from the draws, substantially exceeded the draws after payment of related taxes. It is unreasonable to expect support to be paid from a source that doesn't exist. Such an order would be inherently unstable and leave [Paul] with insufficient funds to meet even his basic living expenses. The Court was initially concerned with the holding of [*Kirk*]. The Court finds that [*Kirk*] is distinguishable because it involved a father who already had a support obligation and voluntarily entered into a debt arrangement that he knew would reduce his support obligation. The present case involves debts incurred before separation, with the consent of both parties, and the income never provided a source to meet the family expenses since there was no net cash flow. *In the event that at some point in the future [Paul's] profit draws after related taxes exceed the deducted note payments, this difference should be considered additional income for the purpose of calculating support.*" (Italics added.) The court repeated the italicized language in the judgment.

Jennifer argues the mandatory note payments are voluntary because Paul could choose to sell his interest in the firm and continue to work for the firm strictly as a salaried, nonowner producer. However, as the trial court noted, Paul incurred the debt for his purchase of ownership in the firm during the marriage with Jennifer's consent and support; he did not become a part owner of the firm after separation. Because Paul agreed to the terms of his part ownership during marriage, including the mandatory diversion of his profit draws to pay down his purchase notes, and became an established owner-producer during marriage, he should not be forced post-separation to choose between divesting himself of his ownership interest in the firm or having his profit draws included in his income for purposes of child support despite the fact they are not presently available as income for that purpose. The trial court reasonably ruled that Paul's profit draws are to be excluded from his income for purposes of calculating child support *until he realizes net income from them*, at which point they should be included as income for purposes of child support.

Although the court did not cite any statutory authority supporting its decision to exclude Paul's profit draws from his income for purposes of support, such authority exists. Section 4058, subdivision (a)(2), provides that annual gross income for the purpose of calculating child support includes "[i]ncome from the proprietorship of a business, such as gross receipts from the business reduced by expenditures required for the operation of the business." Paul is a part owner of the firm, and the note payments that are *mandatorily* deducted from his profit draws are expenditures required for the

operation of his business. Accordingly, section 4058, subdivision (a)(2), authorized the court to exclude the draws from his income for the purpose of child support until such time that they exceed his note payments.

In *Blazer*, the Court of Appeal similarly construed section 4058, subdivision (a)(2). The *Blazer* court decided that for purposes of determining *spousal* support, the trial court had acted within its discretion in excluding from the husband's income funds that the husband used to capitalize and diversify his business. The trial court found it was necessary to diversify the business and that the funds spent for that purpose were reasonable expenses properly charged to the business rather than the husband. (*Blazer*, *supra*, 176 Cal.App.4th at p. 1447.) Although the *Blazer* court acknowledged that "[c]hild support and spousal support serve different purposes, implicate different policies, and are governed by different rules[,]" (*id.* at p. 1446, fn. 3), it observed that "[t]o the extent that [section 4058] may offer guidance, it likewise sustains the trial court's decision here. That statute excludes from income 'expenditures required for the operation of the business.' " (*Blazer*, *supra*, at p. 1448.)

Jennifer cites *Asfaw v. Woldberhan* (2007) 147 Cal.App.4th 1407, 1417 (*Asfaw*) as support for her position that Paul's note payments are not " 'expenditures required for the operation of the business' " within the meaning of section 4058, subdivision (a)(2). However, the issue in *Asfaw* was whether asset depreciation is a business expense that may be deducted from income for purposes of calculating child support. The *Asfaw* court decided it is not, stating: "[A]lthough 'income' is broadly defined in the statutory child support scheme [citation], deduction provisions are specific and narrowly construed

31

[citation]. We find the Legislature's choice of the words 'expenditure,' 'required,' and 'operation of the business' in section 4058 are words of limitation. 'Expenditure' suggests an actual outlay of cash or other consideration. Depreciating an asset does not involve a reduction of cash available for child support. Nor is depreciation 'required' for the operation of a business. A proprietor cannot operate a business without inventory, without employees, without paying taxes, and so forth. A business can be conducted without a deduction for depreciation. We conclude that 'operation of the business' means ordinary and necessary business expenditures directly related to or associated with the active, day-to-day conduct of a business. [Citations.][14] Depreciation of a business asset, by its very nature, is not essential to the day-to-day running of the business, but is intended to promote the continuity of the business over a longer term." (*Asfaw*, *supra*, at p. 1425, fn. omitted.)

"An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' " (*Santisas v. Goodin*

---

14    *Asfaw* cited examples from case law of the meaning of the term "operating expenses" in other contexts, including *Mandel v. Myers* (1981) 29 Cal.3d 531, 543 [1978-1979 Budget Act defined "operating expenses and equipment" as including " 'all expenditures for purchase of materials, supplies, equipment, *services . . . and all other proper expenses*.' "]; *Keller v. Chowchilla Water Dist*. (2000) 80 Cal.App.4th 1006, 1013 [Prop. 218 (Cal. Const., art. XIII D, § 5) defines "maintenance and operation expenses" as " 'the cost of rent, repair, replacement, rehabilitation, fuel, power, electrical current, care and supervision necessary to properly operate and maintain a permanent public improvement.' "]; and *Kirkpatrick v. City of Oceanside* (1991) 232 Cal.App.3d 267, 281 [discussing the finding in a prior unpublished opinion that the city's Manufactured Home Fair Practices Commission properly excluded land lease costs from rent because those costs were "debt service expenses" that were specifically excluded from of normal operating expenses under rent control ordinance].)

(1998) 17 Cal.4th 599, 620.) The point involved and decided in *Asfaw* was whether asset depreciation is a business expense properly deducted from a parent's income for purposes of calculating child support; the *Asfaw* court did not consider the type of expenditure at issue in this case. *Asfaw*'s holding does not necessarily conflict with the conclusion that Paul's note payments are expenditures required for operation of his business as a part owner of the firm. Under the Operating Agreement, which governs ownership, Paul's note payments are a required expenditure in the operation of his business. Although the note payments are not ordinary business expenditures in the sense of payment of wages, rent, utilities, and taxes, or the purchase of inventory, materials, and supplies, they are nevertheless an actual outlay of cash that, unlike depreciation of an asset, involves a reduction of cash available for child support. Accordingly, they constitute "expenditures required for the operation of the business" under section 4058, subdivision (a)(2).

B. Interest deduction

Jennifer contends that "according to both experts," the interest deduction Paul has taken on tax returns for the investment interest he pays on his loans to purchase his interests in the firm should be charged to him as tax-free income in calculating his child support obligation.[15] Jennifer's only legal argument on this point is her assertion that

---

[15] Jennifer cites her expert Cooper's testimony that the *entire* note payment should be included in Paul's income because, in his words, "those note payments represent the acquisition of an asset. They are not payments that [I] would categorize as expenses in the course of the operations of this business of the insurance business." Jennifer's counsel asked Paul's accounting expert Ginita Wall whether Paul's interest payments should be treated as tax free income for purposes of calculating child support. Wall testified that if the interest payments were not deducted from Paul's income for support purposes, they

33

"this expense is not allowed under the California child support statutes . . . ." We presume she means that although this interest deduction was properly taken on her and Paul's 2009 joint tax return, the California child support statutes do not allow it as a deduction from gross income for purposes of child support.[16]

We could disregard Jennifer's contention regarding the effect of the tax treatment of Paul's interest payments on the determination of his income for purposes of child support because she does not explain, with citation to any specific statute or other authority, why Paul's interest payments should be included in his income for purposes of child support. We are not required to consider a contention on appeal that amounts to a complaint of error unsupported by pertinent argument or citation of authority. (*Huntington Landmark Adult Community Assn. v. Ross* (1989) 213 Cal.App.3d 1012, 1021; *Strutt v. Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 873-874.) However, we presume her argument is that deduction of the interest payments from income for purposes of child support is not authorized under section 4059, which provides that the annual *net* disposable income of each parent shall be computed by

would become "nontaxable building income." She was not asked to explain what that term means.

[16] Having already argued that Paul's *entire* note payments, which include both principal and interest payments, should be included in Paul's income for purposes of calculating support, it is unclear why Jennifer contends under a separate argument heading that the *interest* payments on the notes should be included in Paul's income for purposes of child support. If Jennifer's position is that regardless of whether the *principal* payments should be included in Paul's income for support purposes, *interest* payments should be included because they are tax deductible, it is unclear why she contends the *entire* amount of the interest payments should be included, instead of just the amount of the tax savings that Paul realizes from deducting the interest payments from his taxable income. Her contention appears to confuse a tax deductible *payment* with tax free *income*.

deducting from his or her *gross* income the actual amounts attributable to certain items, including the state and federal income tax liability resulting from the parties' taxable income.  (§ 4059, subd. (a).)[17]

To the extent Jennifer is simply arguing that Paul's investment interest payments are not an allowable deduction from annual gross income for purposes of child support even though they are an allowable deduction from taxable income on a tax return, her argument fails in light of our conclusion that Paul's mandatory note payments, which include the interest payments in question, are excluded from Paul's annual gross income under section 4058, subdivision (a)(2).  Section 4059 governs deductions from annual gross income to arrive at annual net disposable income; thus, any expenditure that is excluded from annual gross income under section 4058, subdivision (a)(2), is not part of the net disposable income equation under section 4059 because it has already been excluded from income.  The court did not err in excluding Paul's entire note payments from his income for purposes of calculating child support.

C.  Unreimbursed business expenses

On Paul and Jennifer's joint 2009 tax return, Paul claimed unreimbursed business expenses as a deduction from his gross income from the firm.  Jennifer contends the court should have included these unreimbursed business expenses in Paul's income for purposes of child support because Paul did not produce written proof of them at trial.

---

[17]    Paul has argued in this appeal, and to the trial court, that his note payments are deductible from his gross income under section 4059, subdivision (f), which allows the deduction of "[j]ob-related expenses, if allowed by the court after consideration of whether the expenses are necessary, the benefit to the employee, and any other relevant facts."

35

We presume that Paul's gross income and other information stated under penalty of perjury on his 2009 tax return is correct for purposes of child support. (See, *M.S. v. O.S.* (2009) 176 Cal.App.4th 548, 557; *In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 332. ["Returns are, after all, ultimately enforced by federal and state criminal penalties."]) In calculating Paul's income for purposes of child support, Jennifer's expert Cooper did not deduct the unreimbursed business expenses claimed on Paul's tax return because he *assumed* the firm reimbursed all of Paul's business expenses. He explained, "My experience in this area is that taxpayers stretch the truth a bit sometimes, *and I have no way of knowing if [Paul] did or not*, although I never received any receipts for these expense that were pretty large in amount. So I felt it was fair to allow the amount that was reimbursed each year and not to allow reduction amounts over and above that." (Italics added.) Cooper's testimony is insufficient to rebut the presumption that Paul's gross income and other information stated on his 2009 tax return is correct for purposes of child support, and no other evidence in the record rebuts that presumption.

The court did not err in determining Paul's income for purposes of calculating child support.

## V. *Retroactive Modification of Temporary Child Support*

Jennifer contends that the court erred in denying her request for retroactive modification of temporary child support. She states in her opening brief that she is challenging only the denial of retroactive modification of child support; she is not seeking retroactive modification of spousal support. We conclude the court erred in

36

ruling that it lost jurisdiction to retroactively modify support when Jennifer's OSC requesting retroactive modification was taken off calendar.

As noted in our statement of facts, on March 13, 2009 Jennifer filed an OSC seeking child support, among other things. The court ordered Paul to pay Jennifer child support of $3,000 per month and reserved jurisdiction over support retroactive to March 13, 2009, the date Jennifer filed her OSC. On May 20, 2009, Jennifer filed an OSC/motion seeking modification of child and spousal support and attorney fees and costs. On June 21, 2010, Paul filed an OSC requesting the court to adopt the recommendations of a child custody and visitation mediator and to use the date of separation as the valuation date of his equity interest in the firm.

On August 3, 2010, the parties informed the court (Judge Alksne) of their agreement to have Judge Ashworth of Judicial Arbitration and Mediation Services (JAMS) take over the case. Paul's counsel initially stated to the court, "Two weeks ago I contacted counsel, and I thought we had agreed that Judge Ashworth would be the judge to take the *two pending OSCs* we have in the trial of this case." (Italics added.) Later that day, after Jennifer's counsel confirmed Jennifer's agreement to have Judge Ashworth take over the case, Paul's counsel informed the court, "We've agreed to take this matter to JAMS to try all issues *and all OSCs* and give jurisdiction to Judge Ashworth to handle all of these things." (Italics added.) When the court asked if the parties intended to file a stipulation, Paul's counsel replied, "Yes, we will. . . .We'll vacate the existing OSCs and *reset the trials on OSC* and everything else in front of Judge Ashworth." (Italics added.) At the conclusion of the hearing the court stated: "And all matters that are currently

37

pending in front of Judge Von Kalinowski will be taken off calendar *and reset at Judge Ashworth's pleasure*." (Italics added.) On September 2010, the stipulation and order appointing Judge Ashworth to preside over the case was filed. The stipulation and order stated: "The parties are vacating the existing OSCs and *resetting the OSCs* and trial and *everything else* in front of Judge Ashworth." (Italics added.)

The court (Judge Ashworth) denied Jennifer's motion for retroactive support modification on two grounds. First, the court ruled that it lost jurisdiction over retroactivity when Jennifer's OSC went off calendar, citing this court's opinion in *In re Marriage of Gruen* (2011) 191 Cal.App.4th 627 (*Gruen*). Second, the court ruled that "the original stipulated support order was based on income findings that were approximately correct." We conclude the court was incorrect as to the first ground and must conduct further proceedings to determine the correctness of the original stipulated order.

In *Gruen* the husband filed a petition for dissolution of the marriage and an OSC regarding child and spousal support and other matters. (*Gruen*, *supra*, 191 Cal.App.4th at p. 632.) The court held a hearing on the OSC and ordered the husband to pay the wife $40,000 per month in temporary support, stating the order was made " 'on an interim, without prejudice basis, pending the next hearing.' " (*Id.* at p. 633.) The court also appointed an expert to assist it in determining the husband's income available for support. The court continued the hearing on the husband's OSC, and on the continued hearing date, the husband asked the court to take the matter off calendar insofar as it pertained to support and to continue the initial support order pending preparation of the expert's

38

report. About six months later, the husband filed a motion for " 'retroactive reimbursement' " seeking a reduction in his support obligation retroactive to the date of the court's initial temporary support order. (*Id.* at pp. 633-635.) Based on the appointed expert's final report on the husband's income, the court ordered the husband to pay monthly support in varying amounts that were less than the initial $40,000 award for three different time periods, the earliest of which began on the date of the initial support order. (*Id.* at p. 634.) At a later hearing the court further reduced the awards going back to the date of the initial award. (*Id.* at p. 636.)

This court reversed the *Gruen* trial court's orders retroactively modifying its initial temporary support order, concluding that a trial court lacks jurisdiction to retroactively modify a temporary support order to any date earlier than the date of the filing of a notice of motion or OSC to modify the order. (*Gruen*, *supra*, 191 Cal.App.4th at pp. 631, 638.) That conclusion is based primarily on section 3603, which provides that a temporary or pendente lite support order " 'may be modified or terminated at any time *except as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate*.' " (*Id*. at p. 638; italics added; see also § 3651, subd. (c) [permanent support orders].) Section 3653, subdivision (a), correspondingly provides, with exceptions that do not apply here, that "[a]n order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any subsequent date . . . ."

Paul contends that under *Gruen*, the court correctly ruled that it lost jurisdiction to rule on Jennifer's OSC to modify support when the OSC was taken off calendar as part of the stipulation to have Judge Ashworth preside over and try the case. We disagree. Jennifer's right to a hearing and ruling on her OSC cannot be justly defeated on a technicality. The above-quoted statements of Paul's counsel and Judge Alksne on the record, as well as the language of the written stipulation itself, make it abundantly clear that the parties and the court understood and intended that Judge Ashworth would hear and rule on Jennifer's *pending* OSC after the case was transferred to him. In stating that the parties were "vacating the existing OSCs and *resetting the OSCs* and trial and *everything else* in front of Judge Ashworth[,]" (italics added), the written stipulation and order to transfer the case to Judge Ashworth effectively *continued* the hearing on Jennifer's OSC to an unspecified date and only technically took the matter off calendar. Unlike the husband in *Gruen* when he asked the court to take his OSC off calendar to the extent it pertained to support, Jennifer clearly did not intend to take her OSC off calendar in the sense of removing the matter from the court's consideration and determination. It would be putting form over substance to conclude that the court lost jurisdiction to rule on Jennifer's OSC simply because it was taken off calendar with the *express* understanding of both parties and the court that it would be reset and decided by Judge Ashworth. Judge Ashworth had jurisdiction to hear and rule on Jennifer's OSC to retroactively modify temporary support.

Paul additionally argues that Jennifer was not prejudiced by the court's refusal to hear her OSC because the court awarded her spousal support for 30 months from January 1, 2011 and the marriage lasted only 6 and a half years. Paul notes that the court stated, in connection with its denial of retroactive modification of temporary support, that "the lack of retroactivity has been considered as an equitable factor in determining the length of spousal support." The extent to which the court's spousal support award is properly factored into a determination of the correct amount of temporary child support from the time Jennifer filed her OSC to the time judgment was entered, and whether, in the court's words, "the original stipulated support order was based on income findings that were approximately correct," are matters properly decided by the trial court. Accordingly, we will remand the matter to the trial court for further proceedings on Jennifer's OSC to the extent it seeks retroactive modification of the court's award of temporary child support.

## VI. *Order to Use A Privately Compensated Mediator*

The judgment requires the parties to use a privately compensated mediator to resolve future disputes in developing summer child-sharing calendars. Jennifer contends the court lacked authority to impose the private mediation requirement and requests that it either be stricken from the judgment or that Paul be required to pay the cost of such private mediation. Although there is no statute that expressly authorizes a court to order the parties to participate in mediation with a privately compensated mediator and to pay the cost of the mediation, the court's mediation order in this case is consistent with prior stipulated orders.

41

On March 20, 2009, the parties stipulated, and the court ordered, that the parties would submit to non-confidential mediation "to mediate any disputed child sharing issues and to determine the most appropriate child custody and child sharing plan for the minor children . . . ."  The stipulated order provided that the mediation was intended to be in place of Family Court Services and that Penny Angel-Levy would perform the mediation. The stipulated order further provided that that each party would pay half of the mediator's costs; however, the court reserved "full jurisdiction to allocate the costs of the mediation between the parties and/or the community."  The court also reserved "jurisdiction to make additional appropriate orders if the need arises to assure the timely completion of the mediation."

On July 2, 2009, the parties stipulated and the court ordered that "[i]f *during the pendency of the action*, the parties are unable to agree on any child sharing issues *they shall continue their participation in non-confidential mediation* with Penny Angel-Levy in accordance with the Stipulation Re Appointment of Child Custody and Visitation Mediator filed March 20, 2009.  *Said stipulation remains unmodified and in full force and effect*."  (Italics added.)

In its statement of decision, the court noted Jennifer's belief "that Ms. Angel-Levy is biased against her and that she should be replaced as the recommending mediator." Finding "it would be unfair to Ms. Angel-Levy to remain as the recommending mediator/custody evaluator[,]" the court set forth a procedure for the parties to select a new mediator within 10 days of entry of judgment, with the court retaining jurisdiction to resolve any dispute regarding the selection.  The court also noted "the parties have been

42

unable to agree on an appropriate child sharing plan for raising their two young children."

The judgment reiterated the procedure for the parties to select a mediator within 10 days of entry of judgment, and ordered the parties to meet with the mediator to develop a calendar setting forth their child sharing schedule through the summer of 2012. The judgment provides that "[t]hereafter, in approximately the middle of the summer each year, the parents shall develop the new schedule for the following year. The parents shall continue to use the mediator's services *until they are able to accomplish this task without assistance.*" (Italics added.)

The effect of the March 2009 and July 2009 stipulated orders is that Jennifer agreed to submit to private mediation any custody disputes *during the pendency of the action*. A marriage dissolution action remains pending with respect to child support and custody issues while the child is a dependent minor in order to allow the court to monitor the child's welfare. (*In re Marriage of Kreiss* (2004) 122 Cal.App.4th 1082, 1084.) Accordingly, in child support and custody matters, the family court has continuing jurisdiction even after the court enters judgment. (*Id.* at p. 1085; *In re Marriage of Armato* (2001) 88 Cal.App.4th 1030, 1043 [child support].)

The judgment's mediation directive accords with the court's prior stipulated orders, except for the selection of a new mediator to replace Angel-Levy because of Jennifer's unwillingness to participate in further mediation with her. The July 2009 stipulated order requires private mediation only if the parties are unable to agree on any child sharing issues during the pendency of the action; the judgment requires private mediation only until the parties are able to develop child sharing schedules without the assistance of a

43

mediator. Thus, the judgment does no more than reaffirm the July stipulated order—both require private mediation only if the parties are unable to agree on child sharing issues. Because the mediation directive in the judgment is consistent with the prior stipulated orders, the court did not err in including the mediation directive in the judgment.

Regarding Jennifer's alternative request that Paul be required to pay the cost of such private mediation, we note that under the March 2009 stipulated order, the trial court retained jurisdiction to allocate the costs of the mediation between the parties, which we construe as jurisdiction to order an allocation other than the 50-50 cost sharing specified in the stipulation. If the court were to find that mediation was necessitated by an unreasonable refusal to cooperate on the part of one party only, the court could exercise its discretion to place all or a greater share of the mediation costs on the uncooperative party.

Regarding Jennifer's wish to be free of the stipulation to mediate, we note that "[i]t is within the discretion of the court to set aside a stipulation [where] . . . .there has been a change in underlying conditions that could not have been anticipated, or where special circumstances exist rendering it unjust to enforce the stipulation." (*In re Marriage of Jacobs* (1982) 128 Cal.App.3d 273, 283.) Setting aside a stipulation on such grounds would require factual findings by the trial court. Thus, if present or future circumstances warrant setting aside the stipulation for private mediation, the trial court is the proper forum in which to seek that relief.

VII. *Denial of Request to Include Jennifer's Surname As the Children's Second Middle Name*

Jennifer contends the court erred in denying her request to include her surname as a second middle name for both of the parties' children.  The standards for deciding a request to change a child's *surname* are well-settled.  " '[T]he sole consideration when parents contest a surname should be the child's best interest.' "  (*In re Marriage of McManamy & Templeton* (1993) 14 Cal.App.4th 607, 609.)  Factors to be considered in determining the child's best interest include the length of time the child has used his or her present name; the effect of a name change on preservation of the parent-child relationships; the strength of the parent-child relationships; and identification of the child as part of a family unit.  (*Id.* at pp. 609-610.)  Whether a requested name change is in the child's best interests is a question of fact, and the trial court's determination of that question will be upheld if it is supported by substantial evidence.  (*Id.* at pp. 610-611.)  Although the present case involves a request to add a second middle name rather than a request to change a surname, we believe the same standard for deciding the request applies, namely, whether the requested change is in the child's best interest.

Jennifer first requested the name change for the children on the last day of trial near the end of her testimony on direct examination in conjunction with her request to change her own surname back to her maiden name.  The court expressed the view that changing the children's name would require a separate motion and that Jennifer's request was not "encompassed within the trial issues."  The court stated it "did not know that this particular issue was an issue nor do I think it's encompassed . . . within the pleadings

here." Paul's counsel objected and stated, "This issue was never raised. It's not relevant today, and obviously it's a surprise to everyone on this side of the table . . . . It was not raised as an issue for this trial."

The court reiterated that the changing the children's names "is not an issue that I see is properly before me now and would require . . . the best interest evaluation. And normally we would get input from a mental health professional on this because the issue is not whether you want it or he wants it or doesn't want it. It's whether it's in the best interests of the children is the test, and I have no idea whether it's in the best interests of the children or not to do that." Jennifer responded, "That's fine, Your Honor. It's not something that we wanted to spring on anybody. It's just something that I thought of as I was driving down here." The court concluded the discussion on the issue by stating, "Well, if you decide that you want to pursue it, this isn't the time for it because it's not properly framed. . . . And there's some case law on it as to what needs to be shown to do that, but I don't think it's properly before me now."

Although Jennifer essentially conceded that the name change issue was not properly raised at trial and should be pursued in a separate proceeding, in her written rebuttal to Paul's written closing argument she requested, for the first time in writing, that the children's names be changed to include her maiden name, and she presented argument as to why the name change would be in the children's best interests.[18] Alternatively, she requested "that her name remain intact as 'Jennifer Heidemann DeTrani' so that she may pursue both name changes at the appropriate juncture." Despite its observation at trial

_____

[18]    Paul did not address the name change issue in his written closing argument.

46

that the name change issue was not properly before it, the court decided the issue in its statement of decision and judgment as follows: "[Jennifer's] request to have the children change their names to include a second middle name is denied. This has the potential to be confusing and is not in the children's best interests."

Because Jennifer's name change request was not properly litigated, there is insufficient evidence in the record to support the court's finding that the requested name change is not in the children's best interests. Jennifer first raised the name change issue on the last day of trial near the close of evidence, more or less as an afterthought, and the court made it clear that the issue was not properly before it. Since neither party presented any evidence on whether the requested name change was in the children's best interests, the court could not reasonably make *any* best interests finding. The sole basis the court articulated for its conclusory finding that the requested name change is not in the children's best interests is that the name change "has the *potential* to be confusing . . . ." (Italics added.) The court's view that the name change *may* be confusing at some future point in the children's lives is speculative and not based on any specific evidence, and is thus insufficient to support a finding that the requested name change is not in the children's best interests. Accordingly, we will remand the matter for the court to conduct a proper evidentiary hearing on Jennifer's request to add her maiden name to the children's names as a second middle name.

DISPOSITION

The portions of the judgment denying Jennifer's request for retroactive modification of temporary child support and denying her request to include her surname as the children's second middle name are reversed. The matter is remanded and the trial court is directed to hear and determine Jennifer's OSC filed on May 20, 2009 to the extent it seeks modification of child support, and to decide Jennifer's request to change the children's names after conducting an evidentiary hearing on whether the requested change is in the children's best interests. In all other respects the judgment is affirmed. The parties shall bear their own costs on appeal.

McCONNELL, P. J.

WE CONCUR:

NARES, J.

O'ROURKE, J.